Janet D. *v.* Carros, Appellant.

Argued November 11, 1974.  Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*James A. Esler*, Assistant County Solicitor, with him *Thomas M. Rutter*, Acting County Solicitor, and *Stephen A. Zappala*, County Solicitor, for appellant.

*Max A. Levine*, with him *Eric N. Anderson*, for appellee.

OPINION BY SPAETH, J., March 29, 1976:
This case presents two questions, each of first impression in Pennsylvania, and of first importance: Does a child committed by a juvenile court to a child

welfare agency as a "deprived child"[1] have a right to treatment? If so, may the director of the agency be held in contempt for failing to provide the treatment?

Appellant, Thomas Carros, is the Director of Child Welfare Services of Allegheny County (hereinafter "CWS"). When this action was commenced, appellee, Janet D., was a sixteen year old girl under the protective supervision of CWS.

On June 15, 1973, following the informal detention hearing required by the Juvenile Act,[2] the lower court issued the following order:

"And now, to wit, this fifteenth day of June, 1973, after Shelter Care Hearing, it is ordered and directed that:

1. Said child [appellee] is committed to the Allegheny County Juvenile Detention Home.

2. Child Welfare Services of Allegheny County (hereinafter called 'CWS') is directed to file a petition in the interest of said child by 4:00 P.M. Tuesday, June 19, 1973.

3. CWS is to provide suitable shelter for said child on or before Friday, June 22, 1973, so that she will not have to remain in the Juvenile Detention Home.

4. Said child appears to be retarded and ran away from McIntyre Shelter in March, 1973; it will

---

1. The Juvenile Act, Act of Dec. 6, 1972, P.L. 1464, No. 333, §2(4), 11 P.S. §50-102(4), defines a "deprived child" in relevant part as "a child who: (i) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals; or ... (iii) has been abandoned by his parents, guardian, or other custodian; or (iv) is without a parent, guardian, or legal custodian..."

2. 11 P.S. §50-312(b) provides in relevant part: "An informal detention hearing shall be held promptly by the court or the master and not later than seventy-two hours after he [the child] is placed in detention to determine whether his detention or shelter care is required .... Prior to the commencement of the hearing the court ... shall inform the parties of their right to counsel and to appointed counsel if they are needy persons ..."

therefore be necessary for CWS to make suitable arrangements to see that said child does not run away subsequent to her placement in the shelter facility to be provided by CWS." (Record at 4a-5a).

On June 20, 1973, Bernard Frank, the CWS social worker assigned to appellee's case, filed the petition called for by paragraph 2 of this order. The petition designated appellee a "deprived child," requested that CWS be given "supervision with permission to place," and stated that "[i]t appears that it is in the best interest of said child and the public that she be given a hearing."[3] On June 22 appellee was taken by the Sheriff from the Detention Home to McIntyre Shelter, a facility administered by CWS and designated as "temporary" and "physically unrestricted."[4] On June 25 her appointed counsel[5] wrote a letter to appellant, stating that "[a]t this time, no suitable arrangements have been made, to the best of my knowledge," and demanding that appellant

---

3. Record at 6a. The hearing referred to is described in 11 P.S. §§50-315(a) and 50-320, and is discussed in part V of this opinion, *infra*.

4. 11 P.S. §50-102(5) provides that "shelter care" is "temporary care of a child in physically unrestricted facilities." 11 P.S. §50-311(d) defines those facilities permissible for a child who is considered deprived: "A child alleged to be deprived may be detained or placed in shelter care only in the facilities stated in clauses (1), (2) and (4) of subsection (a) [a licensed foster home or home approved by the court; a facility operated by a licensed child welfare agency or one approved by the court; any other suitable place or facility, designated or operated by the court and approved by the Department of Public Welfare ....] and shall not be detained in a jail or other facility intended or used for the detention of adults charged with criminal offenses or of children alleged to be delinquent."

5. 11 P.S. §50-317 provides in relevant part: "Except as otherwise provided under this act a party is entitled to representation by legal counsel at all stages of any proceedings under this act and if he is without financial resources or otherwise unable to employ counsel, to have the court provide counsel for him ...." *See also, Stapleton v. Dauphin County Child Care Service*, 228 Pa. Superior Ct. 371, 324 A.2d 562 (1974).

comply with the June 15 order. Record at 16a. That same evening, appellee ran away from McIntyre Shelter.

On June 26, appellee's counsel petitioned the lower court for a rule to show cause why appellant should not be held in contempt. Record at 9a.[6] The lower court issued the rule, and after a hearing conducted on July 27, July 30, August 3, and September 4, 1973, filed an opinion on March 29, 1974, finding appellant in "Contempt of the Order of this Court dated June 15, 1973."[7] Pursuant to this finding, the court imposed a fine of $100.00 on appellant, and granted appellee leave to file a petition for compensatory damages.[8]

I

Some background information about appellee and the history of her relationship with CWS is helpful to an

---

6. When the petition was filed, Bernard Frank, individually and in his capacity as a caseworker for CWS, was also named as a respondent. However, the lower court denied the petition with prejudice with regard to Mr. Frank. Record at 47a. No appeal from that denial is before us.

7. Although the lower court does not specify in its order whether the contempt was civil or criminal, it twice refers to the proceeding as a request that appellant be held in civil contempt. (Record at 84a, 87a.)

8. Although the doctrine of sovereign immunity has not yet been abrogated, see Brown v. Commonwealth, 453 Pa. 566, 305 A.2d 868 (1973) it does not bar the action under consideration here. The doctrine applies to the Commonwealth, its departments and agencies. Prior to 1973, suits against units of local government were barred by the doctrine of governmental immunity. That doctrine was abolished in Pennsylvania in Ayala v. Philadelphia Board of Public Education, 453 Pa. 584, 305 A.2d 877 (1973). Ayala was filed on May 24, 1973, one month before appellee's counsel petitioned the court for a rule to show cause, and ten months before the lower court's opinion was filed. Appellant is an employee of Allegheny County, not the Commonwealth. See Act of June 13, 1967, P.L. 31, No. 21, Art. 7, §701 et seq., 62 P.S. §701 et seq. For the same reason, this court, and not Commonwealth Court properly has jurisdiction of this appeal; See Act of July 31, 1970, P.L. 673, No. 223, art. IV, §402, 17 P.S. §211.402(1).

understanding of the events that brought into question whether CWS had complied with the June 15 order.

Appellee was born September 23, 1956, and was one of twelve children. Her father died in December, 1972. Her mother was considered mentally retarded and was cared for by one of the older children, appellee's sister Betty. Appellee has also been designated retarded (see, for example, the June 15 court order, *supra*), because she scored 64 and 76 on I.Q. tests, although one witness at the contempt hearing, Mrs. Laughren, Director of Social Services at McKeesport Hospital, disagreed with this interpretation, considering that appellee's problems derive from emotional disturbance rather than from retardation. (N.T. 66, 7/27/73.)[9]

In 1969, when appellee was 13, she was admitted to McKeesport Hospital as an hysterical child. At that time, she was a resident of Westmoreland County and the Child Welfare service of that county removed her from her home and placed her with a foster family.

On March 28, 1973, appellee was again taken to McKeesport Hospital. Mrs. Laughren testified:

"Janet at that time was very unkempt and dirty, and dressed in clothing that was really heavy winter clothing, had been barefooted. The Emergency Room diagnosed at the time that they saw her acute exposure and feet frostbite. They didn't feel that she needed an admission, however, they did feel that she needed some emotional supports ..." (N.T. 61, 7/27/73.)

Evidently, appellee had run away from her foster home because she had overheard that the court would not continue to make payments for her and that she would have to leave. At first she had returned to her mother and sister, but when they refused to keep her, she went to a neighbor's home. There, according to Mrs. Laughren,

---

9. A school that appellee attended indicated that she was capable of doing work consonant with an I.Q. of 80. (N.T. 22, 9/4/73.).

"The man of the house then declared he wouldn't keep her unless she was cleaner and put her on the kitchen floor, sat on her, and shaved all her hair from her head." (N.T. 62, 7/27/73.)

After the hospital had cleaned appellee and had purchased a wig for her, they attempted to place her with a welfare agency. The Westmoreland County Child Welfare Service disclaimed responsibility because appellee's mother and sister had moved to Allegheny County. Despite this fact, CWS also disclaimed responsibility for appellee. Mrs. Laughren testified:

"Janet was highly disturbed and we saw her as a possible suicide attempt if some treatment weren't effected .... We attempted to persuade Child Welfare [CWS] to allow us to send Janet directly to ... Shelter ... and this was refused. And they insisted that they would have to have the mother, who is retarded, and the daughter ... go to Juvenile Court and to Child Welfare to file a complaint .... This was after about seven or eight phone calls between agencies and all day at the [McKeesport] hospital ...." (N.T. 63, 7/27/73.)

Eventually appellee was committed to McIntyre Shelter. Soon, however, she ran away and returned to her former foster home in Westmoreland County. Three months later she ran away from the foster home, attempting to return to her mother and sister. However, they refused to keep her, she ran away again, and on June 12, 1973, her sister and a minister took her back to the McKeesport Hospital. Mrs. Laughren testified:

"She [the sister] had called the Child Welfare office and seemed to get no cooperation insofar as what she was to do with her sister, so she brought her back to me, hoping we could make some dispositional plan." (N.T. 73, 7/27/73.)

In trying to devise such a plan, Mrs. Laughren encountered considerable difficulty in obtaining the cooperation of CWS. Appellee had been brought to her

office at 9:30 that morning. Mrs. Laughren made numerous telephone calls to CWS, attempting to reach either appellee's caseworker or his supervisor, but her calls were not returned. After six hours, she called the office of the Juvenile Court judge who had previously committed appellee to shelter care. Because of his intervention, Mrs. Laughren was finally able to speak with a CWS supervisor, who advised her to file a petition and to take appellee to Juvenile Court. Appellee's sister followed this procedure, and appellee, although a deprived child rather than a delinquent child,[10] was placed in the Allegheny County Juvenile Detention Home, a facility for delinquents. She remained there for ten days. 11 P.S. §§50-311(d) and 50-321(b) prohibit the placement of deprived children in a facility for delinquents, but the lower court agreed to the placement as a temporary measure to enable CWS to plan for appellee's subsequent placement.[11]

It was against this background that the lower court issued its June 15 order.

## II

It is hardly surprising that the lower court found that appellant had disobeyed the June 15 order, which, it will be recalled, was that appellant was "to make suitable arrangements to see that [appellee] does not run away subsequent to her placement in the shelter facility

---

10. A "delinquent child" is defined as a "child whom the court has found to have committed a delinquent act [defined in 11 P.S. §50-102(2) as a crime under State or Federal law or specific or habitual disobedience of the reasonable and lawful commands of a parent or guardian] and is in need of treatment, supervision, or rehabilitation." 11 P.S. §50-102(3).

11. Although the CWS intake worker with whom Mrs. Laughren spoke attempted to categorize appellee as a delinquent child because of her pattern of running away, counsel for CWS stipulated at the contempt hearing that appellee was in fact a deprived child. (NT. 8-9, 75-76, 7/27/73.)

to be provided by CWS." Briefly stated, the arrangements made were again to place appellee in McIntyre Shelter, and then to provide her with next to nothing in the way of intelligent supervision, counseling, or treatment.

-A-

Since McIntyre Shelter was a "temporary" and "physically unrestricted" facility, *see* footnote 4, *supra,* it would seem that it was *un*suitable for a child, who, as CWS knew from its past experience with appellee (recited in Part I, *supra*), had run away before and was emotionally unstable. This unsuitability was in fact immediately and repeatedly demonstrated.

As already mentioned, on June 25 appellee's counsel wrote appellant demanding that suitable arrangements be made for appellee. That same evening, appellee ran away from McIntyre Shelter. The infirmary records[12] show that she left at 11:15 P.M. and returned several hours later, voluntarily. According to her testimony, "I just went out the door and down the stairs and out the back door." (N.T. 20, 7/27/73.)

Following this first runaway, appellee was placed on "Seven Day Restriction," which meant confining her to the cottage for seven days in pajamas and robe. This restriction was not imposed on all children who ran away. The Shelter Administrator, Paul Aigner, testified, however, that as concerned appellee, "We felt that with pajamas and robe on ... we could hold her in detention ... until possible placement." (N.T. 126, 7/27/73.) Although this suggests awareness that McIntyre Shelter was not a suitable facility for appellee, there is no evidence that any effort was made to find a suitable facility.

---

12. It appears to have been the practice at McIntyre Shelter to refer all runaways to the nurses' office upon their return, and to examine them for evidence of drug abuse. (N.T. 51, 7/27/73.)

On June 28 appellee ran away again. (She explained that "... I have clothes downstairs I kept and I went downstairs with my pajamas on and took the clothes outside." (N.T. 20, 7/27/73.)) Again she returned voluntarily.

On July 4, appellee was reported a runaway for the third time (although she remained on the shelter campus for four hours, her absence was reported as a run). As she was returning to her cottage, she was attacked by four boys also in residence at the shelter, undressed by them, and beaten with a whip. Appellee testified that she feared she would be sexually attacked. (N.T. 23, 7/27/73.) After thirty minutes, a houseparent and the houseparent supervisor subdued the boys and took appellee to the infirmary. The infirmary records describe her condition:

> "Child trembling when brought in the department. Long welts on left thigh of leg. Abrasion left side of back. Superficial scratching on arms. Underpants full of dirt. Outer jeans soaking wet ... Stated she was on her way back to shelter when boys jumped her." (N.T. 49, 7/27/73.)

Bernard Frank, appellee's assigned caseworker, was not informed of this incident for six days, and only learned of it when appellee came to his office to meet with her attorney.

Appellee was again placed on restriction and made to wear pajamas and robe. However, on July 15 she ran away again, stayed away for three days, and returned voluntarily. Her condition on return is described by the infirmary records:

> "Legs very dirty ... condition very dirty. Legs covered with scratches and insect bites, also some on forearms. Had been staying in the woods. Had not eaten since dinner on 7/15. Was wearing gym shorts and short pajama bottoms, long sleeved shirt, no shoes or socks. Very depressed. Is afraid she will be locked up at J.C." (N.T. 49-50, 7/27/73.)

On July 23 appellee left her cottage again, stayed out

all night, and the next morning returned voluntarily. During this absence she stayed within the shelter boundaries.

In summary, although appellee was required to wear pajamas and robe during the entire six weeks (except for four days) that she was at McIntyre Shelter, she ran away five times.

-B-

In his answer to the petition for a rule to show cause why he should not be held in contempt, appellant claimed to have instructed the personnel at McIntyre Shelter that:

"[a] court order had been issued directing that suitable arrangements be made to prevent the child from running away; that special supervision and counseling be given to the child to assist her in adjustment to her placement; that she be carefully watched and that she be told she must not leave the shelter." (Record at 21a.)

It is evident from what has just been said that appellee was not "carefully watched;" she was able to run away five times. It is equally evident that neither was she given "special supervision and counseling ... to assist her in adjustment to her placement."

When appellee arrived at McIntyre Shelter, she met with Mrs. Banaszak, the Shelter Intake Worker. This meeting was arranged at the instruction of Rena Menegaz, Assistant Director of CWS. Miss Menegaz had told Mrs. Banaszak to "[m]ake it quite clear to Janet that the court was interested in her case and wanted her to stay with us .... She [Mrs. Banaszak] was to offer to see, or to make herself available to Janet on demand whenever the child felt pressure, some compulsion to run ...." (N.T. 107,7/27/73.) Thus, rather than providing regular counseling, the burden was put on appellee to seek counseling. During the six weeks appellee spent at the shelter, she never asked to meet with Mrs. Banaszak

for counseling, although she clearly "felt some compulsion to run." Nor, despite appellee's disturbed behavior, did Mrs. Banaszak seek her out.

Appellant testified that he also instructed Miss Menegaz to communicate to Paul Aigner, the McIntyre Shelter Administrator, "... specific directions ... that our houseparents be involved in whatever way might produce the desired results in terms of the [lower court's] Order ...". (N.T. 64, 7/30/73.) Mr. Aigner himself never met with or counseled appellee. Nor did he ever consult her caseworker, Mr. Frank.[13] Instead, he passed Miss Menegaz's instructions on to his assistant, Frank Pruszynski. Mr. Pruszynski never spoke with appellee, or counseled her, or consulted her caseworker. Instead, "I relayed this to Mr. Catalfamo [houseparent supervisor] ... in whose hands I feel this matter was truthfully placed." (N.T. 151, 7/27/73.) Mr. Catalfamo had no higher education or training in counseling. He spoke with appellee in the presence of two houseparents and instructed her not to run away. He also arranged that when two houseparents were on duty at the cottage, one would be assigned solely to appellee and would follow her when she attempted to run away and try to convince her not to run away. Thus, the major responsibility for appellee's care devolved upon the cottage houseparents.[14]

---

13. Nor for that matter did Miss Menegaz consult Mr. Frank before determining what counseling arrangements might best meet appellee's needs: "Who's Mr. Frank? Oh, the caseworker. No, I did not discuss the treatment of this child with Mr. Frank .... The focus of my contact was related to discussing this where I had direct supervision and supervisory responsibility .... Mr. Frank has a supervisor and a senior supervisor and these people help him with developing the treatment plan." (N.T. 106. 108, 7/27/73.)

14. During appellee's six weeks in shelter care, the only meetings shown by the record to have taken place between her and adults other than the houseparents are the initial interview with Mrs. Banaszak, three interviews with her caseworker, and two meetings with Mr. Catalfamo, as well as post-runaway checkups by the nurse.

One houseparent viewed her qualifications for the job as "... having children, working with Girl Scouts, our Brownies, and so on up to the top." When asked if she had any professional training, she answered, "No," and described the in-service training she had received at McIntyre Shelter as "... a schooling that taught you everything from marriage to conception. In other words, into adulthood, down the steps." (N.T. 37, 7/27/73.) Another houseparent responded to questioning about her qualifications that Child Welfare had offered her two classes at which "Everything from birth to adult stages" was discussed. (N.T. 172, 7/27/73.) Indeed, the houseparents recognized that their training and experience had not prepared them for a child with appellee's problems. The cottage manager who supervised the houseparents assigned to appellee's cottage thought that "Janet needs more professional help than what we could give her," and added, "I don't like to make statements, but I think Janet needs treatment." (N.T. 168, 7/27/73.)[15]

The houseparents' task was further made difficult by the fact that they were not placed in contact with appellee's caseworker. One houseparent testified, "We're not allowed to call the caseworker." (N.T. 37, 7/27/73.) Nor were the houseparents given any information about appellee's family, her schooling, her I.Q., or her previous history of foster care. Nor were the reasons for certain arrangements made for her at the shelter communicated to the houseparents. For example, appellee never

15. Appellant testified that "[w]e feel ... that the help the child will receive will be from those persons [houseparents] on our staff." (N.T. 68, 7/30/73.) Not all the CWS staff shared this view. Mr. Frank considered the role of the houseparents to be "a custodial kind of role and not any kind of a counseling role .... without the expertise of ... someone trained in counseling." (N.T. 96, 7/27/73.) Mr. Aigner felt that the houseparents did not counsel their wards: "Well, again, you know, special counseling, this is just ... interpersonal interaction. We're not trying to psych the girl." (N.T. 120, 7/27/73.)

attended special classes offered at the shelter (although both Mr. Aigner and Mr. Pruszynski thought she had (N.T. 119, 153, 7/27/73.) The houseparents, however, did not know why appellee did not attend classes: "If there is a reason, I don't know why, let's put it that way. In fact, I did ask about it and wasn't given an answer." (N.T. 41, 7/27/73.)

In summary: During the six weeks that appellee was at McIntyre Shelter there was no attempt to treat her or to involve her in a program that might alter her pattern of behavior. She received no counseling - at least none by anyone trained to counsel her; and such "supervision" as she received was "special" only in that a special effort was made, in particular, requiring her to wear pajamas and a robe, to confine her to her cottage.

### III

Before it may be decided whether appellee had a right to be treated better than she was, it is necessary to dispose of an issue of mootness.

If the lower court's order were regarded as an order of criminal contempt, this issue would not arise. *In re Martorano*, 464 Pa. 66, 80, 346 A.2d 22, 29 (1975). However, as already remarked, *see* footnote 7, *supra*, the opinion of the lower court makes it plain that the court regarded the proceeding, and therefore presumably the order that issued from the proceeding, as one in civil contempt. On this view of the case, an issue of mootness does arise.

Appellee became eighteen on September 23, 1974, two months before this appeal was argued before our court. She was therefore no longer a "child" as defined in the Juvenile Act[16] when her case was presented for

---

16. Section 102(1) of the Act, 11 P.S. §50-102(1), defines a "child" as an individual who is: "(i) under the age of eighteen years; or (ii) under the age of twenty-one years who committed an act of delinquency before reaching the age of eighteen years." Appellee is not within paragraph (ii).

appellate review. Furthermore, she was released from shelter care on August 3, 1973, and although she remained under the "supervision" of CWS, Record at 49a, 52a, during the pendency of the lower court's hearings on the contempt petition she was housed in private facilities. Appellant cannot, therefore, purge himself of civil contempt by providing superior treatment to appellee:[17] she is too old to be under his supervision and, moreover, has not been a resident in a CWS facility for more than two and one-half years.

Although these considerations, among others to be discussed, constrain us from affirming the lower court's order, *see Salvitti Appeal*, 238 Pa. Superior Ct. 465, 357 A.2d 622 (1976), they do not require that we declare the case moot or otherwise refuse to decide it.

The general rule is that an actual case or controversy must exist at all stages of appellate review. *DeFunis v. Odegaard*, 416 U.S. 312 (1974); *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974); *Roe v. Wade*, 410 U.S. 113, 125 (1973). The policies that this rule seeks to achieve are "... to satisfy three fundamental needs of a judicial tribunal: first, a full record of the facts of the dispute, the raw material of decisionmaking; second, a presentation of opposing claims and defenses related to prior judicial settlements and social policies... ; and third, the potential of effective resolution of the dispute, the *raison d'etre* of the institution." *Mootness on Appeal in the Supreme Court*, 83 Harv. L. Rev. 1672, 1672-73 (1970).

Here, there is a full record: during four days of hearings, the parties and the CWS staff testified in

---

17. A characteristic that distinguishes civil from criminal contempt is the ability of the contemnor to purge himself of the civil contempt by complying with the court's directive. *See In re Martorano, supra.* The Pennsylvania Supreme Court has said that "The conditional nature of the Contempt Order which ... allowed appellant to purge himself of all contempt by complying with the Court's Order within a reasonable time, makes it clearly civil contempt." *East Caln Township v. Carter*, 440 Pa. 607, 614, 269 A.2d 703, 707 (1970).

considerable detail to appellee's background, her experiences while in shelter care, and the procedures followed by CWS in implementing the lower court's order. We must, however, determine whether the opposing claims continue to exist, and whether these claims may still be effectively resolved. We conclude that each of these requirements is satisfied.

First, although appellee did not bring this action as the representative of a class, and although no testimony was received during the hearings concerning the possible adverse effect of CWS's practices on other children, the subject of this appeal may fairly be viewed as a continuing controversy that affects a large number of persons. CWS continues and will continue to serve deprived children; its ability to "make suitable arrangements" for those children will therefore remain at issue. The many problems implicit in appellee's situation may not be precisely duplicated in the case of another deprived child, but CWS will certainly continue to handle children from broken homes, children who run away, and children whose problems make them difficult to place. *See, Dunn v. Blumstein*, 405 U.S. 330, 333 n.2 (although the named appellee met the challenged three month voting requirement, the problem the requirement posed to other Tennessee voters would recur); *Moore v. Ogilvie*, 394 U.S. 814 (1969) (the burden placed on nomination of candidates for state office would control future elections, although the election in question had been held); *Werner v. King*, 310 Pa. 120, 164 A. 418 (1933) (issue concerned the annual duty of a public official); *Commonwealth ex rel. Finken v. Roop*, 234 Pa. Superior Ct. 155, 162, n.4, 339 A.2d 764, 767-768 n.4 (1975) (although appellant was no longer confined to a state hospital, the controversy was a continuing one and affected large numbers of people). *But see, Sosna v. Iowa*, 419 U.S. 393 (1975) (had appellant, who challenged Iowa's residency requirement for a divorce sued only in her own behalf, and not as the representative of a class,

the fact that she satisfied the requirement and had obtained a divorce would make her case moot).

Second, this case presents issues that are by their very nature "capable of repetition yet evading review." *Roe v. Wade*, *supra* at 125; *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498 (1911).

As we have seen, The Juvenile Act, *supra*, 11 P.S. §50-102(5), defines shelter care as *"temporary* care of a child." (Emphasis added.) Moreover, Title 7200 of the Department of Public Welfare Regulations, *Emergency Services for Children*, C. & Y. Manual (1969), §7210 G., provides that "[c]hildren shall not be kept in shelter facilities for more than three months, and successive emergency placements are prohibited." The time required for initial fact-finding, not to mention the process of appellate review, will certainly exceed so limited a period.

Furthermore, the cases most similar to appellee's are the cases most likely to recur and most difficult to review. At the contempt hearings in this case, the Assistant Director of CWS testified that alternatives to McIntyre Shelter existed for younger children, for children with I.Q.'s higher than appellee's, and for children without appellee's history of running away. (N.T. 114, 7/27/73.) Another CWS official described the difficulties CWS experienced in persuading private institutions to accept children with more complex histories. (N.T. 14, 9/4/73.) Appellant testified that these considerations caused him to assume that only McIntyre Shelter could provide the "suitable shelter" mandated by the June 15 order. (N.T. 63, 7/30/73.) From this testimony it appears that it is the older child, such as appellee, who is the most likely candidate for placement in a CWS shelter. Yet, because of her age, she is the child who will have the most difficulty completing an appeal before the case is mooted either by her relocation or by her becoming eighteen.

The mere passage of time can make a case moot. *See*,

*De Funis v. Odegaard, supra,* 416 U.S. 312 (1974) (plaintiff, who did not sue as a representative of a class, had registered for his last semester in law school and would almost certainly graduate; therefore, his challenge to the law school's admissions procedures became moot). *See also Doremus v. Board of Education,* 342 U.S. 429 (1952); *Atherton Mills v. Johnston,* 259 U.S. 13 (1922); *Standard Dairies, Inc. v. McMonagle,* 139 Pa. Superior Ct. 267, 11 A.2d 535 (1940). Here, however, the presence of a full record, the continuing existence of a controversy, its potential effect on others, and the probability that similar claims will recur, yet be difficult to review, convince us that this appeal should not be considered moot.

Third, there is an exception to the general rule that a case or controversy must exist at all stages of appellate review. If one of the parties to the controversy will continue to suffer some detriment from the lower court's decision, the appeal will usually be heard. Here appellant will suffer the adverse effect of having been held in contempt, yet if we declare the case moot because appellee has attained her majority, he will be unable to order any measures by which he might purge himself. In the criminal law, the rule has been that "... a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed ...", *Sibron v. New York,* 392 U.S. 40, 57 (1968). This rule has also been applied in civil cases. *See Moore v. Ogilvie, supra* at 816; *Carroll v. President and Commissioners,* 393 U.S. 175, 178 (1968); *Commonwealth ex rel. Finken v. Roop, supra* at 162, n.4, 339 A.2d at 767-768, n.4. *But see Commonwealth ex rel. Watson v. Montone,* 227 Pa. Superior Ct. 541, 323 A.2d 763 (1974).

Finally, cases "... important to the citizenry as a whole, as when the state acts as substantial trustee for the public ...", have been reviewed even when moot. *Cases Moot on Appeal: A Limit on the Judicial Power,* 103 U. Pa. L. Rev. 772, 788 (1955). *See also Wortex Mills,*

*Inc. v. Textile Workers Union,* 369 Pa. 359, 370, 85 A.2d
851, 857 (1952) (moot question will be decided when
"exceptional circumstances exist or questions of great
public importance are involved"). The question of
whether the director of a public agency may be held in
contempt of a prior court order because of the quality of
care afforded a deprived child committed to a facility
under his superintendence is such a question of great
public importance.

## IV

It is now in order to decide whether appellee had a
legally enforcible right to be treated better than she was.

### -A-

The "right to treatment" has been widely discussed in
the context both of mental health and juvenile care. *See,
inter alia,* Wald and Schwartz, *Trying a Juvenile Right
to Treatment Suit,* 12 Am. Crim. L. Rev. 125 (1974);
BAZELON, *Implementing the Right to Treatment,* 36 U.
Chi. L. Rev. 742, and accompanying articles, 755 - 801
(1969); *A Symposium, The Right to Treatment,* 57 Geo. L.
Rev. 673, 680 - 817 (1969).

The most widely discussed basis for the right has
been constitutional. Several courts have said that
confinement to a mental hospital or to a juvenile
detention facility without providing rehabilitative treat-
ment violates the due process clause of the federal
constitution. U.S. Const. Amend. XIV. Thus, in *Wyatt v.
Stickney,* 325 F.Supp. 781 (M.D. Ala. 1971), the court
held that adequate medical treatment must be afforded
patients civilly committed to a mental hospital, and
wrote: "To deprive any citizen of his or her liberty upon
the altruistic theory that the confinement is for humane
therapeutic reasons and then fail to provide adequate
treatment violates the very fundamentals of due process."
*Id.* at 785. In cases of juvenile detention, whether

temporary or long term, and whether for delinquency or for non-criminal behavior such as running away, confinement without rehabilitative treatment has been held to be a violation of the Eighth Amendment prohibition against cruel and unusual punishment as well as a denial of due process. U.S. Const. Amend. VIII. *See generally Nelson v. Heyne*, 491 F.2d 352 (7th Cir. 1974); *Morales v. Turman*, 364 F.Supp. 166 (E.D. Tex. 1973); *Martarella v. Kelley*, 349 F.Supp. 575 (S.D. N.Y. 1972); *Inmates of Boys' Training School v. Affleck*, 346 F.Supp. 1354 (D.R.I. 1972).

Recently, however, in *O'Connor v. Donaldson*, 422 U.S. 563 (1975), the United States Supreme Court did not find it necessary to decide the issue of whether compulsory confinement such as civil commitment carries with it a concomitant constitutional right to treatment. Although such a constitutional right appears to be emerging, therefore, its existence has not been definitively established.

-B-

A second basis for the right to treatment has been the statutory law of the jurisdiction in question.

In *Rouse v. Cameron*, 373 F.2d 451 (D.C. Cir. 1966), Chief Judge BAZELON found a statutory right to treatment for institutionalized mental patients in the 1964 Hospitalization of the Mentally Ill Act, D.C. Code 21-562 (Supp. V, 1966). Finding that "[t]he patient's right to treatment is clear," *id.* at 456, he specified criteria for determining whether adequate treatment is being afforded in conformity with the statute: "According to leading experts 'psychiatric care and treatment' includes not only the contacts with psychiatrists but also activities and contacts with the hospital staff designed to cure or improve the patient. The hospital need not show that the treatment will cure or improve him but only that there is a bona fide effort to do so. This requires the hospital to

show that ... periodic inquiries are made into the needs and conditions of the patient with a view to providing suitable treatment for him, and that the program provided is suited to his particular needs .... The effort should be to provide treatment which is adequate in light of present knowledge." *Id.*

In *Creek v. Stone*, 379 F.2d 106 (D.C. Cir. 1967), a statutory right to treatment was found in a juvenile case. There, the appellant alleged that his temporary confinement in the District of Columbia Receiving Home was unlawful in part because there were no facilities for the psychiatric care he claimed he needed. The Juvenile Court refused to hold a hearing on the suitability of the Receiving Home as a place of detention for appellant. The Court of Appeals held that the Juvenile Court should have made the appropriate inquiry to ensure that "statutory criteria, as applied to that particular juvenile are being met," *id.* at 111, and relied on the following statutory provision: "When the child is removed from his own family, the court shall secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given him by his parents. 16 D.C. Code §2316(3) (Supp. V, 1966)." *Id.* at 109.

The court wrote that "[t]he Congressional objective comprehends psychiatric care in appropriate cases," *id.* at 109, and did not find the fact that confinement to the Receiving Home was "interim" rather than "final" to be determinative:

"The jurisdiction of the Juvenile Court is comprehensive and is to be taken as attaching at the earliest stage necessary to implement the broad rehabilitative purposes of the law .... If a psychiatric condition were seriously endangering the health or perhaps life of the juvenile, there would likewise be jurisdiction in the Juvenile Court to make an appropriate detention arrangement .... the purpose stated in 16 D.C. Code §2316(3) - to give the juvenile the care 'as nearly as possible' equivalent to that which should have been

given by his parents - establishes not only an important policy objective, but, in an appropriate case, a legal right to a custody that is not inconsistent with the parens patriae premise of the law." *Id.* at 110-111.

See also *Haziel v. United States*, 404 F.2d 1275 (D.C. Cir. 1968); *In re Elmore*, 382 F.2d 125 (D.C. Cir. 1967); *In re Harris*, 2 Crim. L. Rep. 2412 (1968).[18]

-C-

In the present case, whether appellee had a constitutional right to treatment need not be decided; the right was given her by the Juvenile Act, *supra*, 11 P.S. §50-101 *et seq.*

The fundamental purpose of statutes such as the Juvenile Act is to provide for treatment of children, whether delinquent or deprived, and not merely for their punishment or confinement. The state, as parens patriae, has a duty to care for its more dependent citizens, especially young people who are without the requisite parental supervision. *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257 (1972). *See generally* Paulsen, *Kent v. United States: The Constitutional Context of Juvenile Cases*, 1966 Sup. Ct. 167, 173-174. Thus in an early case, in which the constitutionality of one of the first juvenile acts was upheld, our Supreme Court wrote:

"To save a child from becoming a criminal, or from continuing in a career of crime ... the legislature surely may provide for the salvation of such a child, if its parents or guardian be unable or unwilling to do so, by bringing it into one of the courts of the state ... for the purpose of subjecting it to the state's

---

18. In *State of New Jersey, in the Interest of D.F., a Juvenile*, 138 N.J. Super. 383, 351 A.2d 43 (Camden Juv. Dom. R. Ct. 1975), the court held that a constitutional and statutory right to treatment required that a juvenile be placed in a private residential facility where he would receive psychiatric treatment.

guardianship and protection. The natural parent needs no process to temporarily deprive his child of its liberty ... to save it ... from the consequences of persistence in a career of waywardness, nor is the state, when compelled, as parens patriae, to take the place of the father for the same purpose, required to adopt any process ... " *Commonwealth v. Fisher*, 213 Pa. 48, 53, 62 A. 198, 200 (1905).

Because the purpose of juvenile acts is to provide treatment, not punishment, it has been held that a child will not be accorded the procedural rights implied in a criminal proceeding. In *Commonwealth v. Henig*, 200 Pa. Superior Ct. 614, 189 A.2d 894 (1963), we said that "the juvenile court proceedings ... constitute merely a civil inquiry or action looking to the treatment, reformation, and rehabilitation of the minor child ... " *Id.* at 619, 189 A.2d at 896. Although the child's procedural rights have been expanded, *see In re Gault*, 387 U.S. 1 (1967); *Kent v. United States*, 383 U.S. 541 (1966), the ideas that "the child was to be 'treated and rehabilitated' ... and the procedures were to be 'clinical'," and "that the state was proceeding as *parens patriae*", have remained. *In re Gault, supra* at 15-16.

Consistent with these ideas, the Juvenile Act throughout its many provisions mandates the treatment of deprived and delinquent juveniles. 11 P.S. §50-101(b)(1) defines one of the purposes of the Act as "to provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this act." A deprived child requires the "care or control necessary for his physical, mental, or emotional health or morals ...." 11 P.S. §50-102(4). A "custodian" is one who stands "in loco parentis." 11 P.S. §50-102(7). The court may order an investigation of the child's background and requirements for physical and psychological treatment. 11 P.S. §§50-319, 50-320(e). The child's custodian has "the right and duty to provide for the care, protection, training, and education, and the

physical, mental, and moral welfare of the child, subject to the conditions and limitations of the order ..." 11 P.S. §50-327. The word "treatment" is used in several provisions. *See* 11 P.S. §§50-320(e), 50-322. The responsibilities of the juvenile court and of the child's custodian include the development of a treatment plan and the carrying out of that plan by the party who stands in the place of the child's parents. No limitations are placed on the words "care" and "protection," which include such treatment as the court and the custodian find appropriate to the individualized needs of the particular child.

It only remains to define the kind of treatment to which appellee was entitled. In *Rouse v. Cameron, supra,* the court defined the kind of treatment to which a mental patient had a statutory right, stating that although psychiatrists differ as to what constitutes appropriate treatment, "lack of finality cannot relieve the Court of its duty to render an informed decision." *Id.* at 457. We must fulfill that responsibility here.

In addition to the formal requirements imposed by the Juvenile Act, CWS was bound by the regulations published by the Department of Public Welfare governing treatment of children in emergency care. The Public Welfare Code, Act of June 13, 1967, P.L. 31, No. 21, art. 7, §701, 62 P.S. §701 *et seq.*, sets forth the powers and duties of the State Department of Public Welfare in the field of child welfare. Section 703 provides:

"The department shall make and enforce all rules and regulations necessary and appropriate to the proper accomplishment of the child welfare duties and functions vested by law in the county institution districts or their successors. All rules and regulations which the department is authorized by this section to make with respect to the duties and functions of the county institution districts or their successors shall be binding upon them."

Title 7200 of the Departmental Regulations,

*Emergency Services for Children,* D.P.W.C. & Y. Manual, §7201 *et seq.* (1969), specifies the treatment required for children in temporary shelter care. As the record shows, however, CWS failed to follow several applicable sections of these regulations in its treatment of appellee.

Section 7210 C. requires that shelter care be provided "with staff to give good physical and psychological care." (It was contrary to this regulation to put the burden of seeking counseling on appellee; it was likewise contrary to the regulation to make untrained houseparents principally responsible for appellee.)

Section 7231 requires planning for and analysis of the needs of the child in shelter care:

"7231.1. *Intake*

A social study shall be made on each child no later than a week after placement. It shall include:

1. basis for receiving the child into the shelter facility.

2. significant information about the life experience, personality, behavior patterns, development, attitudes toward parents, and needs of the child.

3. significant information about the personality of the parents and their life experiences, including their attitudes toward the child, their understanding of the placement plan, and their ability to cooperate with the agency in continual planning for the child.

4. adequate information about the health history of members of the family.

7231.2. *Social Work and Medical Services*

a. Social work services shall be available for the child and his parents.

b. The caseworker shall maintain a continuing relationship with the child while he is in emergency care through regular contacts with him.

c. Constant effort shall be made by the caseworker, with involvement of the parents, to make discharge plans for the child as soon as possible."

(Despite appellee's initial interview with Mrs. Banaszak, no intake study as outlined in this regulation appears to have been completed or even begun. Mr. Frank, appellee's social worker, did not maintain the required "continuing relationship" with appellee; nor was he incorporated into any plans developed for her. Indeed, there was no evidence of any planning for appellee's future while she was in shelter.)

Section 7232.1(a) requires that

"Each child shall be provided with his own clothing, which shall be comfortable, well-fitting, and appropriate in style."

and Section 7232.9(f) that

"Each child shall be allowed to have his own personal possessions and to acquire others while he is in the shelter facility."

(To restrict appellee to wearing pajamas and a robe was contrary to these provisions.)

Section 7232.4 requires that

"An educational program adapted to the special needs of the child shall be arranged for by the agency in consultation with the appropriate school district."

(The failure to see to it that appellee attended the special classes contravened this regulation.)[19]

Taken together, the Juvenile Act and the Department of Public Welfare Regulations quoted above establish that appellee had a right to treatment conforming to the following minimum requirements:

---

19. With respect to appellee's emotional difficulties, it may also be noted that the Director of the Allegheny County Mental Health/Mental Retardation program testified that on several occasions he had offered appellant the resources of his agency, to be incorporated into the program at McIntyre Shelter, but that appellant had responded that because "the shelter was operating with children on a temporary basis, he did not feel that putting in treatment personnel would be appropriate." (N.T. 10, 7/30/73.)

1.  An analysis of her personal history, to determine her physical, psychological, and educational needs;

2.  The development of an individualized treatment program based upon those needs;

3.  The provision of the counseling, psychiatric, educational, recreational, and social work services required by the individualized treatment program, and the incorporation of her caseworker into the program;

4.  The formulation of a longer-term placement plan, based on analysis of her needs;

5.  Adequate communication and consultation about her and the plans for her future among all levels of the staff;

6.  Periodic re-evaluation of the treatment program developed for her in terms of her behavior in response to the treatment, and revision of the program as necessary;

7.  Application of disciplinary measures consistent with her dignity.

These requirements will not prevent the professionals trained in the field from applying their knowledge and skills. To the contrary, they will help to ensure that the professionals do apply their knowledge and skills, as did not happen in the case of appellee. Nor are we preempting the role of the social work and child welfare experts in defining the statutory requirements for treatment of deprived children. The line between the proper and improper exercise of judicial review may not always be clear. However, courts have long reviewed the decisions made by administrative agencies to see whether an agency's expertise was correctly applied in a given case without themselves administering the agencies or usurping the function of the experts charged with those responsibilities:[20]

"It is often unclear precisely what scope of review is appropriate or what result such review demands. But

---

20. *See also* The Supreme Court, 1974 Term, 89 Harv. L. Rev. 47, 74 n.39 (1975).

the principle of a division of responsibility between administrators skilled in their area and judges skilled in the law is clear and has proved workable .... No judge would claim the ability to prescribe a particular therapy for a 'chronic undifferentiated schizophrenic.' But neither would any judge allocate AM frequencies to avoid interference. That is not his task in either case; his role rather is to determine whether a capable expert has studied the problem fully and reached a defensible result." BAZELON, *Implementing the Right to Treatment, supra,* 36 U. Chi. L. Rev. 742, 744-45 (1969).

That an approach conforming to the minimum requirements outlined should have been followed in appellee's case was confirmed by the experts who testified for appellee.[21] Among others, Miss Ruth Succopp, Director of Social Service and Chief Psychiatric Social Worker, Children's Hospital, Pittsburgh, testified:

"What I would have liked to have seen is much more collaborative effort and more team approach. I think that all that are involved in the care of this girl need to decide on what are the goals, what does one want to direct their attention towards, and sit down and mutually decide how best this can be fulfilled. I

---

21. We note that when appellee was provided with treatment more suited to her needs, she responded by changing her behavior. After leaving McIntyre Shelter in August, 1973, appellee was sent to Amicus House, a temporary shelter and residential treatment center. There the counseling staff sought her out, and she made regular visits to a psychiatrist, who met with members of the staff to discuss the treatment provided her. The Director of Amicus House testified: "I think there are some real changes. She is becoming more and more aware that by running away she is hurting herself. Running away is just not running away to her in the real sense. It is not just leaving the place physically, but suicide is a kind of running away. Her verbal attacks are in a sense a way of running away. She is asking now for some ways of changing these kinds of behavior. Her threats of running have decreased tremendously. It used to be in the beginning a daily thing and now it may be four or five days before she even talks about it." (N.T. 99, 9/4/73).

really didn't hear this. I didn't hear any support of each other on the team or collaborating and deciding what kind of help can we give her at this time." (N.T. 53, 7/30/73.)

In *Nelson v. Heyne, supra* at 360, where a right to treatment for incarcerated juveniles was upheld on both constitutional and statutory grounds, the court stated: "In our view the 'right to treatment' includes the right to minimum acceptable standards of care and treatment for juveniles and the right to *individualized* care and treatment. Because children differ in their need for rehabilitation, individual need for treatment will differ. When a state assumes the place of a juvenile's parents, it assumes as well the parental duties, and its treatment of its juveniles should, so far as can be reasonably required, be what proper parental care would provide. Without a program of individual treatment the result may be that the juveniles will not be rehabilitated, but warehoused. ... their interests and those of the state and the school thereby being defeated." (Emphasis in original.)

So here. Without the individualized planning that we find to be an essential element of the "treatment" required by the Juvenile Act, little more can be expected than the sort of custodial care that was afforded appellee.

## V

There can be no doubt that the lower court could enforce appellee's right to treatment by adjudicating in contempt those who were ordered to provide the treatment. Not only was this an inherent power of the court, *see generally, In re Martorano, supra,* but it was a power specifically conferred on the court by the Juvenile Act.[22] The question is, however, whether the court

---

22. 11 P.S. §50-336 provides: "The court may punish a person for contempt of court for disobeying an order of the court or for obstructing or interfering with the proceedings of the court or the enforcement of its orders subject to the laws relating to the procedures therefor and the limitations thereon."

properly exercised its power. We have concluded that the court did not, for three reasons: the procedure followed by the court in conducting a contempt hearing was precipitous and contrary to the procedure required by the Juvenile Act; the order of June 15, 1973, of which appellant was found in contempt, was ambiguous; and the order of March 29, 1974, adjudicating appellant in contempt, was improperly stated.

-A-

The Juvenile Act provides for a two-step process: first, emergency detention, followed by an informal detention hearing; and second, submission of a petition, a more complete hearing, and a final order of disposition. Here, only the first of these two steps was taken.

-1-

It will be recalled that appellee was brought to the court by her sister Betty and placed in the Detention Home on June 12, 1973, before any hearing had been held. The Juvenile Act provides for such an emergency. 11 P.S. §50-309 states, in relevant part:

"A child taken into custody shall not be detained or placed in shelter care prior to the hearing on the petition unless his detention or care is required to protect the person or property of others or of the child ... or because he has no parent, guardian, or custodian or other person able to provide supervision and care for him ...."

The Act requires, however, that such an emergency detention must be followed by an informal detention hearing, provided by 11 P.S. §50-312(b):

"An informal detention hearing shall be held promptly by the court ... and not later than seventy-two hours after [the child] is placed in detention to determine whether his detention or shelter care is required under Section 12 [11 P.S. §50-309]."

This hearing was held by the court on June 15, 1973, and it is the basis of the June 15 order, which refers to it as a "shelter care hearing." Thus, the lower court completed the first step of the two-step process provided by the Juvenile Act.

-2-

It will also be recalled: that the June 15 order directed CWS "to file a petition in the interest of [appellee]"; that on June 20, CWS did file such a petition; and that the petition designated appellee a "deprived child" and stated that "it is in the best interest of said child and the public that she be given a hearing." This looked forward to the second step of the two-step process provided by the Juvenile Act.

11 P.S. §50-315(a) provides:
"After the petition has been filed the court shall fix a time for hearing thereon, which, if the child is in detention, shall not be later than ten days after the filing of the petition. If the hearing is not held within such time, the child shall be immediately released from detention."

*See generally, Commonwealth ex rel. Watson v. Montone, supra.* The purpose of this hearing is to enable the court to formulate an individualized order. 11 P.S. §50-320(e) provides that the court may continue the hearing: "On its motion or that of a party the court may continue the hearings under this section for a reasonable period to receive reports and other evidence bearing on the disposition or the need for treatment, supervision or rehabilitation. In this event the court shall make an appropriate order for detention of the child ... during the period of the continuance."

And 11 P.S. §50-319 provides:
"(a) If the allegations of a petition are admitted ... the court, prior to the hearing on need for treatment or disposition, may direct that a social study and

report in writing to the court be made ... concerning the child, his family, his environment, and other matters relevant to disposition of the case ....

"(b) During the pendency of any proceeding the court may order the child to be examined at a suitable place by a physician or psychologist ..."

Upon conclusion of the hearing, the court is required by 11 P.S. §50-320(a) to "make and file its findings as to whether the child is a deprived child .... If the court finds that the child is not a deprived child ... it shall dismiss the petition and order the child discharged ...."

Finally, 11 P.S. §50-321 provides that the court shall issue an order in the interest of the deprived child:

"(a) If the child is found to be a deprived child the court may make any of the following orders of disposition best suited to the protection and physical, mental, and moral welfare of the child:

. . . .

"(2) Subject to conditions and limitations as the court prescribes transfer temporary legal custody to ... (ii) an agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child or (iii) a public agency ...."

In the present case the lower court never took this second step. Although CWS petitioned for a hearing, none was held; the court therefore neither received evidence bearing on appellee's particular needs, nor made findings of fact, nor issued an individualized order based on such findings. Instead, in response to the petition filed by appellee's counsel, the day after she first ran away, the court proceeded directly into the contempt hearing. Consequently, the order of June 15, of which appellant was found in contempt, was not a final, individualized, order but only preliminary in nature.

-B-

"[C]ourts should be explicit and precise in their commands, and should only then be strict in exacting

compliance. To be both strict and indefinite is a kind of judicial tyranny." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 195 (1949) (FRANKFURTER, J., dissenting). Thus a party may not be held in contempt of court for failing to obey an order that is too vague or that cannot be enforced. "The most fundamental postulates of our legal order forbid the imposition of a penalty for disobeying a command that defies comprehension." *International Longshoremen's Association v. Philadelphia Marine Trade Association*, 389 U.S. 64, 76 (1967). An order must be sufficiently definite so that the alleged contemnor knows what terms he is violating. *In re Rubin*, 378 F.2d 104 (3d Cir. 1967). Moreover, "the longstanding and salutary rule in contempt cases is that ambiguities and omissions in orders redound to the benefit of the person charged with contempt." *Ford v. Kammerer*, 450 F.2d 279 (3d Cir. 1971). *See also Lichtenstein v. Lichtenstein*, 425 F.2d 1111 (3d Cir. 1970).

Here, the June 15 order - no doubt because of its preliminary nature - was ambiguous in two respects.

The first ambiguity in the order was in the phrase "suitable shelter." At the contempt hearing, the lower court stated during a colloquy that it had not intended to specify McIntyre Shelter as the place to which appellee was to be sent: "There's no reference to McIntyre Shelter." (N.T. 114, 7/27/73.) The reason for the phrasing of the order was explained in the lower court's opinion:

> "The Court Order had omitted designating what 'suitable shelter' was to be provided for this child, thereby leaving it to the discretion of the CWS authorities where Janet should be placed. The order did, however, recite the fact that Janet had run away from McIntyre Shelter in March of 1973 and was suspected of being retarded. McIntyre is a shelter ... most commonly used by CWS for the temporary shelter of deprived children ...." (Opinion at 71a).

Nevertheless, the lower court did not communicate with sufficient clarity the fact that facilities other than

McIntyre would be considered "suitable." The order did not suggest alternatives to McIntyre, nor did it exclude McIntyre. As the lower court itself recognized, McIntyre was the facility most commonly used by CWS for the temporary placement of deprived children. The mere recitation in the order that appellee had previously run away from McIntyre and that she appeared to be retarded did not by itself provide sufficient guidance to appellant as to what a "suitable shelter" might be.

To be sure, the lower court is correct when it says that "[t]he record is bare of any mention of an attempt by anyone from CWS to obtain clarification, construction or modification of the Order." (Opinion at 72a.) In *McComb v. Jacksonville Paper Co.*, *supra* at 187, a decree required the respondents to comply with specific minimum wage, overtime, and record-keeping provisions of the Fair Labor Standards Act. Although the decree itself was general, it enjoined violations of those specific requirements. The Court said:

> "Decrees of that generality are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown .... Yet if there were extenuating circumstances .... [r]espondents could have petitioned the District Court for a modification, clarification or construction of the order .... But respondents did not take that course either .... They knew they acted at their peril. For they were alerted by the decree against any violation of specified provisions of the Act." 336 U.S. at 192.

Here, however, appellant was not so alerted. The order referred to no provision of the Juvenile Act, and enjoined no specific violations. In fact, the lower court left the interpretation of the order to the discretion of CWS. (Opinion at 71a, *supra*.) Having failed to provide adequate guidelines as to what it expected of CWS, the court should not have held appellant in contempt for exercising the very discretion that the court assumed he would exercise.

The second ambiguity in the order was in the statement, "it will therefore be necessary for CWS to make suitable arrangements to see that said child does not run away ...." This statement provided no guidance as to what arrangements the lower court might consider suitable. The court could assume that appellant was fully familiar with the provisions of the Juvenile Act and Title 7200 of the D.P.W.C. & Y. Manual. Nevertheless, we can see no reason for the court's omission of such operative terms as "treatment," "plan," and "program," which would have indicated to appellant that more was expected than merely an attempt to retain appellee on the premises of McIntyre Shelter.

The lower court explained that its order was left general "to avoid usurping the judgment of personnel trained in good social work principles, as we assume most of the CWS staff is. There should not have been any misunderstanding." (Opinion at 86a.) We cannot agree with this reasoning. The generality of the order permitted appellant to conclude that custodial care consistent with the statutory requirement that the shelter care remain "physically unrestricted," 11 P.S. §50-102(5), was intended. This was not what the lower court had desired, as its opinion clearly indicates. The record shows that the lower court had had difficulty in placing appellee with CWS on two occasions, in March and in June of 1973. Given that experience, it was unfortunate that the lower court assumed that its understanding of "good social work principles" and the principles that appellant would choose to apply to appellee's situation were identical. It was incumbent upon the court to state explicitly what it wanted appellant to do, and to make certain by the clarity of its order that appellant would not conclude that "suitable arrangements" meant only appellee's confinement. Such explicitness would not have usurped the judgment of the social work professionals. Indeed, as already discussed, the Juvenile Act contemplates that after the second hearing provided for by the Act, the

court will issue an order "[s]ubject to conditions and limitations as the court prescribes" in light of the child's particular needs. 11 P.S. §50-321.

In its opinion, the lower court relies heavily on *Landman v. Royster*, 354 F.Supp. 1292 (E.D. Va. 1973). There, the defendants, who were prison officials responsible for administering the Virginia penal system, were found to be in violation of an injunction against "performing ... or permitting the performance of any acts *found in the memorandum of the Court* to be violative of the prohibition against cruel and unusual punishment." *Id.* at 1294. (Emphasis added.) Other requirements had been imposed in the injunction, including informing "all members of the custodial staff ... of the injunctive terms of this order." *Id.* at 1294. Thus, in contrast to the present case, specific acts had been prohibited and specific procedures required. Moreover, the court had directed that the staff be informed of the terms of the injunction; here there was no such directive.

-C-

In *Knaus v. Knaus*, 387 Pa. 370, 377, 127 A.2d 669, 672 (1956), it is stated:

"The purpose of a civil contempt proceeding is remedial, and judicial sanctions are employed 1) to coerce the defendant into compliance with the court's order, and 2) in some instances to compensate the complainant for losses sustained .... A judgment in a civil contempt proceeding for the benefit of a private plaintiff will, of course, incidentally vindicate the authority of the court .... But the test is the dominant purpose, not the incidental result."

It follows that "[e]very order which imposes punishment for civil contempt should state the condition which will, upon fulfillment, result in the release of the defendant or the remission of the fine." *Id.* at 379, 127 A.2d at 673-674. Here, however, the lower court's order of March 29,

1974, adjudicating appellant in contempt of the order of June 15, 1973, simply imposed a fine of $100 on appellant. The order did not specify any actions that appellant might take or any standards that his agency, CWS, might meet in order that he might purge himself. Nor did the opinion accompanying the order contain any such specification; rather, it criticized appellant and CWS for "slavish adherence to rigid bureaucratic channels" and a "general lack of humane concern for children." (Opinion at 73a.) Understandable as this criticism is, it does not tell appellant what steps to take so as to comply with the order of June 15, 1973.

In *Doe v. General Hospital,* 434 F.2d 423 (D.C. Cir. 1970), the court specified the conditions under which a hospital would be required to perform therapeutic abortions, "in view of the repeated conflicts between the parties and the continuing inaction on the part of the hospital." *Id.* at 425. And in *Spangler v. Pasadena City Board of Education,* 384 F.Supp. 846 (C.D. Calif. 1974), the court ordered measures by which a school board could purge itself of contempt for refusing to obey an order specifying procedures for desegregating the school system and for hiring minority adminstrative personnel. There was no such specification here.

The order of the lower court adjudicating appellant in contempt is reversed.

WATKINS, P.J., and HOFFMAN and VAN DER VOORT, JJ., concur in the result.