417 A.2d 708

**In the Interest of Jerry GREEN, a juvenile.**

**Appeal of COUNTY OF ALLEGHENY.**

Superior Court of Pennsylvania.

Argued Oct. 26, 1978.

Filed Jan. 4, 1980.

398

Loraine Tabakin, Assistant County Solicitor, Pittsburgh, for appellant.

Sarah C. McIntyre, Neighborhood Legal Services, Pittsburgh, for appellee.

Before CERCONE, President Judge, and WIEAND and HOFFMAN, JJ.

HOFFMAN, Judge:

Appellant, County of Allegheny (County), contends, *inter alia*,[1] that the lower court erred in (1) denying the petition for involuntary commitment of Jerry Green; and (2) purporting to commit Jerry pursuant to its authority under the Juvenile Act. We disagree and, accordingly, affirm the order of the court below.

Jerry Green's parents placed him with his maternal grandmother shortly after his birth in 1971. The child was, however, severely mentally ill, and in 1976 his grandmother placed him with Child Welfare Services of Allegheny County (CWS) because she could no longer care for him. CWS filed a petition to have the child declared deprived as defined in section 50–102(4)(i) of the Juvenile Act.[2] The lower court approved the petition on January 12, 1977 and granted supervision of the deprived child to CWS. The court also ordered that, pending the filing of an involuntary commitment petition, Jerry was to remain in the psychiatric unit of a private hospital where CWS had placed him on the previous day. Mental Health/Mental Retardation (MH/MR), another county agency, filed a petition for Jerry's involuntary commitment under section 304 of the Mental Health Proce-

1. *See* note 6, *infra*.

2. Act of December 6, 1972, P.L. 1464, No. 333. The current version of the Juvenile Act refers to deprived children as "dependent" children. 42 Pa.C.S.A. § 6302.

dures Act (MHPA)[3], alleging that long-term inpatient treatment of the child was necessary. The lower court dismissed the petition but, pursuant to its prior "deprived" determination, ordered that Jerry remain in the psychiatric unit until there was room for him at a state mental institution. Additionally, the court ordered CWS to pay for the continued interim placement at the hospital with the right to seek reimbursement from the state. The County appealed from this order of the lower court.

A court may order involuntary commitment under the MHPA only upon clear and convincing evidence that the person is severely mentally disabled and in need of treatment. 50 P.S. § 7304(f). Severe mental disability exists where, "as a result of mental illness," the person's "capacity to exercise self-control, judgment and discretion in the conduct of his affairs . . . is so lessened that he poses a clear and present danger of harm to others or to himself." *Id.* § 7301(a). One manner in which clear and present danger may be established is by showing that within the past 30 days

> the person has acted in such a manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter or self protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded . . . .

*Id.* § 7301(b)(2)(i). Finally, the Act provides that "[t]reatment on a voluntary basis shall be preferred to involuntary treatment and in every case, the least restrictions consistent with adequate treatment shall be employed." *Id.* § 7102.

Conflicting evidence of the extent of Jerry's mental disability was presented to the lower court. Dr. John Hitchcock, the treating psychiatrist at the hospital where Jerry had been placed when he was initially adjudged deprived, testified that Jerry probably suffered from child psychosis

---

**3.** Act of July 9, 1976, P.L. 817, No. 143.

schizophrenic type. He described incidents in which Jerry would bang his head against a wall and would fling himself down a hall, oblivious to fixed objects in his path. The doctor also stated, however, that such violent incidents had diminished during Jerry's 90 day stay in the psychiatric ward. Finally, although Dr. Hitchcock testified that Jerry could benefit from extended inpatient treatment in a mental institution and needed a great deal of supervision, he conceded: "I don't think he is in immediate danger to himself; but he gets almost to that point in my experience." Dr. Axelson, director of the children's center at Mayview State Hospital, testified that Jerry should be placed in the state mental institution not for safety purposes, but for specialized treatment to benefit the child. The lower court concluded that the evidence adduced did not rise to the level of showing clear and present danger of death or serious injury should Jerry not be involuntarily committed. We agree.

The terms of the clear and present danger standard applicable to this case are relevant only to mentally ill *adults*. Of course no five-year-old child could provide the necessities of life for himself. Therefore, we must ascertain whether, without care above and beyond that normally given a child of his age, this child would be subject to the reasonable probability of death, serious bodily injury, or serious debilitation within 30 days. The County in this case did not present clear and convincing proof that without excessive care and supervision, Jerry would have been subject to the probability of death or serious injury. Even Dr. Hitchcock did not believe that Jerry was an immediate danger to himself. Moreover, many of the incidents to which Dr. Hitchcock testified occurred more than 30 days prior to the hearing and, therefore could not be considered. 50 P.S. § 7301(b)(2)(i). On this record we cannot disagree with the conclusion of the hearing judge that there was an insufficient showing of clear and present danger. In addition, the policy which favors voluntary over involuntary commitment militates against a finding of clear and present

danger on such a record. The involuntary commitment petition was, therefore, properly denied.

The Juvenile Act empowers the hearing judge to provide for disposition of a deprived child "best-suited to the protection and physical, mental and moral welfare of the child." 11 P.S. § 50–321. The possible dispositions of the child enumerated in the Act include: permitting the child to remain with his parents subject to certain conditions; transferring custody to an individual; transferring custody to a private or public agency empowered by law to provide care for the child; and transferring custody to the juvenile court of another state. *Id.* The Act specifically provides, however, that where a deprived child is mentally ill, the court shall proceed under the provisions of the MHPA or the Mental Health and Mental Retardation Act of 1966 (MH/MR Act).[4] *Id.* § 50–326.

Section 7201 of the MHPA,[5] entitled "Persons who may authorize voluntary treatment," provides, in pertinent part:

> A parent, guardian, or person standing in loco parentis to a child less than 14 years of age may subject such child to examination and treatment under this act, and in so doing shall be deemed to be acting for the child.

The hearing judge determined that the quoted language empowered the court to subject a deprived child to examination and treatment under the MHPA when all parties agree that such treatment is in the child's best interest. We agree. "The state, as parens patriae, had the duty to care

---

4. Act of October 20, 1966, Spec.Sess. P.L. 96, No. 3.

5. Although operation of the portion of section 7201 as it applied to juveniles under the age of 14 was enjoined for a period of time by the United States District Court, *Institutionalized Juveniles v. Secretary of Public Welfare,* 459 F.Supp. 30 (E.D.Pa.1977), the United States Supreme Court recently upheld the constitutionality of the statute. 442 U.S. 640, 99 S.Ct. 2523, 61 L.Ed.2d 142 (1979). The Supreme Court held that, although commitment deprives a child of a substantial liberty interest, the voluntary commitment procedures of the MHPA are sufficient to protect a child's right to due process. *Id.* at 649, 99 S.Ct. at 2528.

for its more dependent citizens, especially young people who are without the requisite parental supervision." *Janet D. v. Carros*, 240 Pa.Super. 291, 316, 362 A.2d 1060, 1072 (1976) (citations omitted). The parens patriae doctrine had traditionally been interpreted broadly in order to give juvenile courts the needed flexibility in disposing of cases involving deprived or delinquent children. *In re William L.*, 477 Pa. 322, 338, 383 A.2d 1228, 1236 (1978); *Holmes Appeal*, 379 Pa. 599, 603, 109 A.2d 523 (1954); *Janet D. v. Carros, supra*, 240 Pa.Super. at 316, 362 A.2d at 1072.[6] We conclude that, pursuant to the doctrine of parens patriae, the juvenile court in this case stood in loco parentis to the mentally ill deprived child, Jerry G. Particularly in view of the fact that all parties to the action agreed that commitment to Mayview State Hospital was the appropriate disposition for the child, we hold that the hearing judge properly subjected Jerry to observation and treatment under section 7201 of the MHPA.[7]

Order affirmed.

**6.** "Although the child's procedural rights have been expanded, *see In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), the ideas that 'the child was to be "treated" and "rehabilitated" and the procedures . . . were to be "clinical" ', and 'that the state was proceeding as *parens patriae* ', have remained. *In re Gault, supra*, 387 U.S. at 16, 87 S.Ct. at 1437." *Janet D. v. Carros, supra*, 240 Pa.Super. at 316, 362 A.2d at 1072.

**7.** Appellant's final contention is a two-pronged attack upon the aspect of the order which provided that CWS was to pay for Jerry's continued interim placement in a private hospital. First, appellant contends that the lower court lacked the power under the Juvenile Act to place the child in a private psychiatric unit. Because we have determined that the court acted pursuant to the MHPA and only tangentially pursuant to the Juvenile Act, we need not determine the extent of his power when he acts *solely* pursuant to the Juvenile Act. Second, appellant argues that the lower court erred in ordering the County to pay for Jerry's interim placement in the private facility subject to the right to seek reimbursement from the state. The County asks us to hold that the Commonwealth is obligated to pay for the child's interim care. The Commonwealth is not, however, a party to this action, and appellant does not allege that it has sought and been denied reimbursement by the state. We therefore find this contention prematurely raised and do not resolve it on this appeal.