Robert Jewell **LANDMAN** et al.

v.

**M. L. ROYSTER**, etc., et al.

Civ. A. No. 170–69–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Jan. 29, 1973.

See also D.C., 354 F.Supp. 1302.

Philip J. Hirschkop, Alexandria, Va., for plaintiffs.

Vann H. Lefcoe, Asst. Atty. Gen. of Va., Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Under date of October 30, 1971, this Court issued a memorandum and order, 333 F.Supp. 621, enjoining the defendants, who are responsible for the maintenance and running of the Virginia penal system, "from performing, causing to perform, or permitting the performance of any acts found in the memorandum of the Court to be violative of the prohibition against cruel and unusual punishment." The Court further directed that the defendants implement certain minimum due process procedures to be observed in administering discipline, to prepare and file with the Court a list of rules and regulations concerning standards of behavior, to take steps to make the inmate population aware of these rules, and to take all "necessary steps to inform all members of the custodial staff of all units of the Virginia State Penitentiary system of the injunctive terms of this order."

Subsequently, on July 18, 1972, the defendants filed a motion to vacate the injunction, alleging that the Court's injunction had contributed to a state of permissiveness and unrest which was endangering penal security. Thereafter, the plaintiffs, by written motion, petitioned for an order requiring the defendants to show cause why they should not be held in contempt of court for failure to obey the letter and spirit of the Court's order.

This matter came on for hearing on November 21, 1972. After the presentation of testimony by the defendants in support of their motion to vacate, the Court for the reasons stated from the bench granted plaintiffs' motion for a directed verdict. Not a scintilla of evidence was offered by defendants in support of their allegation concerning the existence of an emergency or of any link between any alleged unrest and the Court's injunction. A fair and reasonable conclusion is that the motion was precipitated by the plaintiffs' announced intention to seek an order of contempt against the defendants. Evidence was then heard on plaintiffs' contempt motion.

The evidence presented to the Court can be divided roughly into three contentions by the plaintiffs of allegedly contemptuous actions on the part of the defendants. First, there was evidence in support of a claim that the defendants arbitrarily placed certain maximum security prisoners on padlock, isolation and in the old death row cells without first providing them with the hearings required by the Court's order. Second, there was evidence concerning the alleged failure of the defendants to ensure that the Court's order was implemented throughout all levels of the penal system. Finally, evidence was presented in support of the plaintiffs' contention that the defendants had failed to provide inmates at disciplinary hearings the procedural requirements made a part of the injunction. From all of the evidence adduced, the Court makes the following findings of fact and conclusions of law:

Throughout the Spring of 1972, it appears that tension was building in the maximum security section (C–Block) of

the State Penitentiary.[1] By May, the tension had erupted into several disturbances, including the setting of small fires in the cells, floodings, and prolonged periods of yelling by the inmates. Prior to these disruptions, however, the custodial staff had begun to fear that a wholesale takeover of C–Block was being planned. In response, they ordered that all inmates in C–Block be placed on padlock. The effect of such padlock is the restriction of every inmate to his cell and the restriction of any congregation at all among those incarcerated in C–Block. The decision to padlock all of the prisoners seems to have been made jointly by the defendant Slayton, Superintendent of the penitentiary, and the C–Block custodial staff. No hearings were held prior to the step, and no charges were placed against any of the inmates.

Three of the inmates who seem to have contributed heavily to the existing tensions were Victor Cassara, Wiley Reynolds and James Peterson. Each appeared as a witness in this action. All have lengthy records of trouble with the prison authorities and other inmates. During the fall of 1971 and the spring of 1972, all were held, at one time or another, on C–Block padlock, isolation, and in the old death row cells, which are completely segregated from the rest of the inmate population. Peterson's case is of particular concern with reference to the pending motion.

In April of 1972, Peterson was transferred from the maximum security building at the State Farm to the general population of C–Block at the State Penitentiary. The guard in command of C–Block at the time was Lt. H. Catron, with whom Peterson had, slightly more than a year prior thereto, been involved in a serious altercation. Some three weeks after his transfer, Peterson was placed on padlock status at the order of Catron. The reasons assigned by Ca-

tron for his actions were that Peterson talked louder than other inmates in the mess hall, entered and left his cell slower than the others, and evidenced anger over the failure to be given his typewriter and over the lack of ready access by the guards to fire extinguishers (this concern was precipitated by a fire in a cell near Peterson's). This transfer was effected summarily, without prior authorization by the Institutional Classification Committee (ICC). Subsequently, on May 30, Peterson was again summarily transferred by Catron, this time to isolation, for allegedly breaking the padlock on his cell. An Adjustment Committee hearing, which was not accorded Peterson until six days later, resulted in a decision to continue him in isolation for a certain number of days as punishment for his alleged misbehavior.

As the period for Peterson's incarceration in isolation ended, the C–Block officers expressed their concern over his return. Apparently, he was felt to be so disruptive and intimidating to other inmates that the security of C–Block was threatened by his return. Accordingly, the Institutional Classification Committee ordered that he be kept in isolation, which was done for a number of days. He was thereafter transferred to the old death row cells in East Basement (of A Building), then to what is described as the new ones in the basement of B Building, after Slayton decided that his incarceration in solitary might be violative of the Court's order. Peterson, as well as Cassara, Reynolds and several other inmates who were kept in these cells, remained confined on padlock, despite the fact that there was an exercise room available for just the new death row cells. Peterson had remained in such confinement from July, 1972, until after the hearing on this matter in November. The Court has learned, however, that he has now been transferred out of the penitentiary to a field correctional unit.

1. The Court has visited the C–Block and unhesitatingly states that the physical arrangement and the procedures to which the inmates are subjected leave no doubt in the Court's mind that the cell block is in and of itself punitive in nature.

From the Peterson case, as well as from other testimony, the Court reaches several conclusions. First, there developed in C–Block, and the Court is satisfied in other areas throughout the penal system as well, an approach of ordering inmates into a higher security classification than they had previously been in prior to affording them a hearing. Such an approach violates both the letter and the spirit of the Court's order. By the precise and unequivocal terms of the order, the defendants are enjoined from the imposition of penalties prior to a hearing that conforms to the necessary due process requisites. Similarly, though not by express terms, the spirit of the Court's order mandates that an inmate who is transferred to a higher security classification for any appreciable period of time be afforded an opportunity for a hearing. This is normally accomplished by the Institutional Classification Committee. Common sense dictates, however, that there will be times when the exigencies of the situation require that an inmate be placed in confinement before a hearing can be convened. The Court recognizes this and has never suggested that such summary action prior to a hearing is prohibited.

The evidence before the Court, however, is that confinement prior to hearing became the rule in certain cases rather than the exception. The Peterson case cited previously is a prime example. The reasons presented to the Court, while they may have created suspicions which would justify greater confinement, do not show the sort of emergency conditions that would require immediate incarceration. More importantly, even if they did, an inmate such as Peterson was and is entitled to be afforded a hearing as soon as practicable after his confinement. The ICC normally held hearings according to a set schedule, as a consequence of which an inmate might have to wait several days or longer before being heard. Such a delay, in the absence as here of any reasonable justification therefor, cannot be tolerated.

█ The Court has for over three years endeavored to express its appreciation of the security problems which the defendants face, particularly in view of a crowded, antiquated facility, manned generally by an untrained, understaffed and in some instances potentially physically incapable guard force. It may well be that a sort of intuitive suspicion on the part of a guard is sufficient to confine a man to a greater security status in order to prevent difficulties. The Court is fully cognizant that we deal with a constant potential danger. But even in the face of this, the inmate must be afforded a hearing immediately thereafter in order that he may present his defense, if any, and in order that prison officials other than the acting officer might confirm that the latter's suspicions are justified. The defendants have knowingly failed to afford inmates such hearings as are required, not only by law but by simply fairness as well, and, in so doing, have failed to obey the Court's order.

The cases of Peterson, Reynolds and Cassara also present a rather disturbing use of the padlock system. All of these men were held on padlock or in the death row cells (under padlock conditions) for a number of months. Reynolds, for example, appears to have remained on padlock or in isolation continuously from October of 1971 until the present. Although the plaintiffs sought to characterize this detention as punitive in nature,[2] the Court concludes that there were genuine security reasons associated with the detention of these men.

█ Nevertheless, the Court is duty bound to be concerned over the apparent loss of privileges which these men suffered. Unless an inmate is intentionally deprived of his privileges by the Adjustment Committee as punishment, he

---

2. Such detention was specifically declared unlawful in Ferrell v. Huffman, 350 F.Supp. 164 (E.D.Va.1972).

should not be made to bear any of the incidents of same. To the contrary, he should receive at least those privileges as the exigencies of his special incarceration allow. Thus, there appears to be no reason why prisoners incarcerated in East Basement should not be allowed, as they have been deprived, to pursue educational opportunities or have access to the portable library. Unfortunately, it would seem from the evidence that, at least for a period, such amenities were not offered these prisoners.

Similar considerations apply to the matter of exercise, although the evidence before the Court was to the effect that there were security reasons for not allowing inmates on padlock or in the old death row cells to be freed for exercise purposes. If these problems can be overcome, however, as the Court is satisfied they can be, inmates so situate should be allowed exercise. Particularly in the new death row cells, where there is an exercise room that had formerly been utilized by death row inmates, there appears to be no valid reason for not allowing exercise. In any event, the defendants are duty bound to use their best resources to try to overcome any potential obstacles to allowing exercise.

The Court is further concerned over evidence which it heard concerning prolonged periods of isolation to which some inmates are subjected. Although the Court's order did not expressly address this issue, the defendants' own regulations place a maximum of 15 days in isolation detention for each charge. However, by charging inmates with several different offenses growing out of one set of facts, prison officials have been able to greatly extend that limit. Both Reynolds and Peterson testified that since the Court's order they have been placed in isolation for a continuous period of over 40 days. Although part of this period in the case of these two men appears to have been imposed by mistake, the fact remains that they remained for a prolonged period in isolation.

The Court is convinced that this practice violates the terms of the injunction issued against the prison officials on August 13, 1968, in Mason v. Peyton, C.A. No. 5611-R (E.D.Va.). That order provided that "no inmate be placed in isolation or solitary confinement as punishment in such a manner or for such a period of time as would be detrimental to his physical and mental health, as determined by a qualified practicing physician." There is no evidence that the defendants ordered a doctor to visit on a regular basis the men kept in solitary for over fifteen days. Although this failure does not constitute contempt on the motion presently before the Court, it is a practice which the defendants must adopt in order to be in conformity with a prior order of this Court.

As to the plaintiffs' second claim, the evidence before the Court is virtually uncontradicted that there was considerable misunderstanding and confusion by lower level custodial staff throughout the penal system as to the meaning and effect of the Court's order of October 30. This confusion was revealed by the testimony of guards, higher prison officials, and even inmates. Indeed, the evidence presented by the defendants themselves in support of their motion to vacate suggests that any apprehensions felt by lower level security officers were less the result of the Court's order than of the failure to be informed as to the actual meaning and effect of that order.

The Court is convinced that any confusion that exists is directly attributable to the failure of the defendants to inform their lower level personnel as to the injunctive terms of the Court's order. The record is replete with explanatory memoranda issued by W. K. Cunningham, Director of the Department of Corrections, and his legal advisors to the various superintendents. There is a gaping absence, however, of such memoranda or other formal systematic communications by Cunningham or the superintendents to lower personnel. Fur-

**1298**

ther, there appear to have been few, if any, comprehensive oral explanations of the Court's decision.

On the other side of the coin, there was also a failure by the defendants to determine for themselves whether the Court's order was being implemented on the lower levels of the penal system. The testimony of Cunningham, in particular, reveals a serious lack of knowledge as to whether lower custodial personnel understood and were carrying out the terms of the injunction.

The failure to disperse information and to supervise the implementation of the Court's order constitutes a direct violation of the same, which specifically required the defendants to take the necessary steps to advise members of the custodial staff of the terms of the injunction. This requirement was not imposed lightly. As this Court's Appellate Court noted in Landman v. Peyton, 370 F.2d 135 (4th Cir. 1966), both the educational level and job training of prison guards leaves much to be desired. In order for them to perform their jobs in a proper manner, these guards must be carefully guided by their superiors. Particularly in a case such as this, when fundamental changes in the established order are instituted rapidly, there is an obvious need for clear and precise guidance. That guidance was here ordered, but not given.[3]

Defendants' failure to instruct their staffs on the Court's decision, in addition to violating the order on its face, has resulted in additional violations. The Court considers that the Peterson case, for example, can be attributed directly to the failure of the defendant Cunningham, through defendant Slayton, to inform his guards adequately as to the full purport of the Court's order.

In testimony before the Court, Lt. Catron stated that it was his understanding that under the Court's order he could place an inmate on padlock, or even in isolation, keeping him there until the ICC had had an opportunity to consider a status change. Catron's testimony, and the facts surrounding the Peterson case, made clear that he had no comprehension of the sort of emergency situation which must exist under this Court's order before such summary status shifts can be made. It was not until August of 1972, nearly ten months after the filing of the Court's order, that an express directive was made to Catron by A. E. Slayton, Superintendant of the Penitentiary, directing him to use padlocking prior to an ICC determination only "where absolutely needed." In sum, the Peterson incident presents a glaring example of the failure of a guard in a position of considerable authority to be apprised of an important aspect of the Court's order and of the deprivation to an inmate which resulted from this failure.

At least one official evidenced serious doubt that the guard force was intellectually capable of comprehending the Court's findings and order; a conclusion which, if accurate, placed upon the responsible officials an even greater duty and responsibility to explain in detail the requirements of law.

The evidence also is clear to the effect that the defendants failed to follow the Court's directive of taking "such steps as may reasonably be necessary to cause each member of the inmate population to be aware of the rules and regulations" required by the Court to be compiled. Although copies of these rules were posted at various places throughout the institutions, it appears they were, as the

---

3. Inherent in these proceedings is an undercurrent of disagreement by at least some of the penal officials of the propriety of the Court's injunctive relief. This attitude is even more disturbing in view of the Court's open encouragement, at and subsequent to the time of the injunctive order, directed to the State officials to appeal the Court's order. The Court recognized the full impact of its legal conclusions and their effect on the penal system and even more than usual encouraged an appeal to the end that there be no hesitancy on the part of the defendants to adhere to the law.

defendants by reason of their past experience ought to have known they would be, often torn down soon after posting by inmates who wanted personal copies. The result was that more often than not an inmate who desired to examine the list was unable to do so. Moreover, no provision was made to enlighten those inmates who were on padlock or otherwise unable to view the list at the selected posting areas.

It is perfectly obvious that the defendants did not take all steps practicable to ensure that inmates had access to the rules. Fortunately, this failure was resolved at trial by virtue of an agreement between counsel to prepare a booklet containing the rules for issuance to every inmate in the institutions. While this appears to resolve the problem of notice for the future, it does not excuse the neglect in the past.

The evidence that the Court has heard also compels the conclusion that the minimum due process procedures which the Court ordered have not been fully implemented. In particular, three shortcomings are evident. First, until September of 1972, attorneys who were retained by inmates to represent them at Adjustment Committee hearings were allowed only to observe such hearings and not to take an active part in them a situation which borders on the ridiculous. Second, it was a practice of at least some of the Adjustment Committee officers to limit the number of witnesses which any inmate could call to two, regardless of circumstances. Thirdly, the right of cross-examination was in some instances denied *en toto* or severely restricted.

The first of these failures, concerning attorneys, gives rise to the unpleasant prospect that it was attributable either to an apparent failure on the part of the defendants and their legal counsel to comprehend the Court's order, or an intention to thwart same. The Court, quite frankly, cannot fully comprehend the motive of this failure. In recognizing that an inmate has the right to se-cure legal representation for certain hearings, the Court meant precisely that—legal *representation*. It is inconceivable that this should have been construed to mean that the attorney could play the role of only an observer. Nevertheless, the Court has concluded that the frustration which must be visited upon any humane prison administrator who has to work within the obviously limited resources available to the defendants, must in fairness be considered before reaching so drastic a conclusion as that the failure was designed to thwart the Court's order. The Court attributes the failure to a lack of recognition that a prison administration is not a fief unto itself. Coupled with this antiquated notion that a prison unit is not even peripherally a part of a community is the practice over the years, that has been shown the Court in this and in other prison cases, to envelop the system with a massive veil of secrecy. More concern seems to have been given to the image of the prison's administration than to the granting to its inmates not only such constitutional rights as they are entitled to in spite of their incarceration, but also the basic tenets of conduct which simple fairness, interpreted by even the most uneducated be accorded them as well. These cases are permeated by an apparent lack of understanding on the part of some of the defendants as well as on the part of at least some of their subordinates that the retribution required by law to be inflicted upon a convict had already, within the limits of the legislatively set boundaries, been pronounced by a trial court.

The other due process shortcomings appear, once more, to have resulted from the failure of the defendants adequately to instruct their staffs. Adjustment Committee officers were informed that they could place limits on the number of witnesses called. While reasonable limits for hearings in the prison context are necessary, an absolute limitation of two is arbitrary. Proper guidance by the defendants should have prevented this result from occurring. Similar lim-

itations on the right to cross examination also seem to have been imposed, though the record does reveal that the defendants at least informed their subordinates that the inmates have such a right.

The Court heard considerable evidence on a wide variety of other matters which have occurred in the penal system since the issuance of the Court's order. Most of this evidence, though giving insight into the way in which the prison is operated, does not show acts constituting contempt of the Court's order. For example, the training of guards in riot tactics on the baseball field of the State Penitentiary, which clearly inflamed the inmates, may have been bad judgment, but it was not contemptuous. The case of James Boyd, a young inmate who was struck by guards during a struggle and subsequently placed in isolation without a hearing, may involve violations of the Court's order.[4] However, it is clear that any potential violations involve isolated acts by lower custodial personnel and do not amount to contempt by the defendants.

From all of the evidence presented to it, this Court can reach but one conclusion: the defendants have failed to implement and obey, both in letter and spirit, the directives of this Court's injunction. It follows from such a conclusion that the defendants have been in contempt of this Court's order.

 The power of civil contempt, inherently vested in every court which exercises equity jurisdiction, makes the injunction an effective judicial remedy. *Cf.* United States ex rel. Brown v. Fogel, 395 F.2d 291, 293 (4th Cir. 1968). Civil contempt, as distinguished from criminal, is designed to insure that the victorious party in an action secures the full relief which the Court granted to it. It does not seek, as does criminal contempt, to vindicate and protect the authority of the Court itself. See Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 31 S. Ct. 492, 55 L.Ed. 797 (1911). Accordingly, the sanctions which are imposed for civil contempt are not punitive in nature, but rather seek "to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949).

 Viewing the evidence as a whole, and giving unto the defendants, as the Court deems it appropriate so to do, the benefit of every doubt, the Court cannot conclude that the defendants' violations of the injunctive order were wilful. For example, the Court is satisfied that the actions of the defendant Slayton were not done with a malicious intent to refuse to obey the directives of the Court. Nevertheless, the conclusion that he and other of the defendants did not maliciously refuse to obey the directives of the Court does not render the defendants immune from civil contempt, for wilfulness of behavior is not a necessary ingredient. As stated by Mr. Justice Douglas in McComb v. Jacksonville Paper Co., *supra*, at 191, 69 S.Ct. at 499,

> [t]he decree was not fashioned so as to grant or withhold its benefits dependent on the state of mind of respondents. It laid on them a duty to obey specified provisions . . . An act does not cease to be a violation of . . . a decree merely because it may have been done innocently.

Indeed, even the presence of good faith on the part of the defendants is no defense. This is because the purpose of civil contempt is not to punish, but to correct. If the plaintiffs have been deprived of that which the Court ordered, as has indeed occurred here, then the role of the Court is not to fix blame on the defendants, but rather to prevent a

---

4. The evidence here indicates that the use of force was occasioned by reason of the fact that the custodial personnel involved were men of such an age as to render them generally physically incapable of subduing a recalcitrant young man without the use of weapons.

recurrence and to repair any damage that has been done. This duty devolves upon the Court regardless of whether the defendants tried in good faith to carry out the terms of the injunction. Doe v. General Hospital, 434 F.2d 427 (D.C.Cir. 1970).

During the proceedings on this matter, the Court heard much from the defendants about the complexity of the Court's order and the fundamental changes which it called for in the operation of the Virginia penal system. If these pleas were in support of an argument that the Court's order is too ambiguous to be followed, then they are not well taken. Although it is of course true that the failure to obey an injunction that is too vague or complex to be understood does not constitute contempt, McComb v. Jacksonville Paper Co., *supra*, at 195, 69 S.Ct. 497 (Frankfurter, J., concurring), the Court concludes after a careful reexamination of its order that it was not inexplicit. If the defendants had thought at any time that it was, they could have petitioned the Court for clarification or modification, or, more basically, could have appealed the Court's decision. They did not take either step, however, and that inaction coupled with the patently frivolous, baseless motion to vacate filed by the defendants, not only creates doubt in the Court's mind as to the sincerity of their pleas now made, but gives rise to a maxim not unfamiliar to football players to the effect that the best defense is a good offense. If that be the strategy of the defendants, their plan has been thwarted by the fact that the inmates at the penitentiary, for reasons perhaps best known to themselves, have apparently succumbed to the teaching that where there is a wrong there is a remedy, and the most effective place to effect such a remedy is through the judicial process. In any event, the Court rules as a matter of law that any alleged justification of their actions by the defendants on the ground that the Court's previous order was vague and hence unenforceable is devoid of merit.

It remains to be determined what steps the Court should now take in regard to these defendants. Imprisonment is clearly not in order. If the defendants had flatly and continually refused to obey the Court's order, then indefinite incarceration might well be needed. But the evidence before the Court does not suggest that the defendants wilfully disobeyed the Court's order or that they will do so in the future.

The violations most likely resulted from carelessness and perhaps from a failure to realize fully the gravity of the Court's order. Such an attitude stemmed no doubt from the long-held conception of prison administrators, noted previously, that their discretion over their charges is so great that they could not be held accountable for their actions to any outside body. Coupled with all of the foregoing is the Court's view that the limitations placed upon those directly in charge of the operation of the penitentiary are, by reason of an apparent lack of financial resources, so great as to make their task an almost impossible one. The Court cannot overlook the fact that there have been no serious disruptions on the part of the prison population. While this is a credit to the population, it is also indeed a credit to men such as Mr. Slayton, Mr. Oliver and certain of their subordinates. What each must be assured of, however, is that the Court has reached the end of the road insofar as searching for alternate punishments consistent with its duties.

What is needed to secure future compliance, therefore, is not imprisonment, but rather something which will impress upon the defendants the need to take all steps necessary to carry out all facets of the Court's order. A fine may be used for such purposes. United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Accordingly, the Court will impose a fine of $25,000, jointly and severally, on all of the named, living defendants in this action. The Court will, however, suspend the imposition of this fine on the condition that the defendants forth-

with take such steps as are necessary to carry out the Court's order and, in particular, that they implement some means of insuring that the terms of the injunction are carried out on every level of the prison system.

 The Court may also impose a fine, payable to the plaintiffs, to the extent of the actual loss incurred by the plaintiffs. United States v. United Mine Workers, *supra*, 330 U.S. at 304, 67 S.Ct. 677. In this case, however, there has been no evidence as to the extent of losses which the inmates have suffered and, indeed, the Court doubts that any injury that did occur could be quantified. Accordingly, compensatory damages will not be assessed against the defendants. Similarly, the granting of attorneys' fees does not appear to be an appropriate response to a finding of contempt. In order to secure such fees, plaintiffs must bring a separate motion before the Court.

In addition to the imposition of a fine, the Court will amend the original order to require the defendants to take further steps to ensure that the Court's order is fully implemented. Specifically, the defendants will be ordered to take steps to ensure that prisoners being held on higher level security classifications for security purposes be afforded as many of the privileges enjoyed by inmates in general population as the nature of their confinement allows. The defendants will further be ordered to ensure that custodial personnel are fully advised of the rules and regulations. The excuse offered by one official that he doubted the custodial staff would comprehend will, if accurate, simply require that the defendants either pierce any such suggested incomprehension by use of educational tools, or replace any such personnel with ones who are capable of understanding. Such steps may include memoranda, seminars and conferences. In addition, the defendants may be well advised to consider the establishment of some sort of formal grievance procedure by which inmates can make known any complaints which

they may have over the failure of the Court's order to be implemented or, for that matter, over any other issue. The Court will not, however, order such a procedure, since it has not heard evidence on its feasibility.

An order in accordance with this memorandum will issue within five days of this date, and the Court in the meantime will entertain a suggested form of order from any of the parties.