Ralph S. **MAJOR**, Jr., d/b/a Major & Associates, Plaintiff,

v.

**ORTHOPEDIC EQUIPMENT COMPANY, INC., Defendant.**

Civ. A. No. CA230–72–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Aug. 1, 1980.

Ralph S. Major, Jr., pro se.

Kenneth V. Farino, Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiff, Ralph S. Major, Jr., doing business as Major & Associates ("Major"), commenced this action for injunctive and monetary relief on May 2, 1972. Defendant, Orthopedic Equipment Company, Inc. ("OEC") is a corporation organized under the laws of the State of Indiana. This action arises from a contractual dispute regarding plaintiff's status as a distributor for OEC. There being diversity of citizen-

ship between the parties and an amount in controversy in excess of $10,000, subject matter jurisdiction vests in the court pursuant to 28 U.S.C. § 1332.

Five motions are presently before the Court. OEC has moved to dissolve the permanent injunction entered by the Court, and to have plaintiff held in contempt of that injunction. Plaintiff has moved to reinstate Franklin I. Saemann as a defendant, to have the Court reconsider or clarify its interpretation of the permanent injunction and to have OEC and several of its officers held in contempt. The parties have filed memoranda with the Court setting forth their respective positions on each of the pending motions. The Court also heard testimony and received evidence on these matters in a hearing conducted on January 30 and 31, and February 1, 1980. The motions are thus ripe for disposition.

Many of the facts relevant to the pending motions have been established in prior proceedings in this action. Consequently, those facts are not in dispute. It is necessary, however, to summarize the history of this action in order to fully comprehend the issues which remain for disposition.

Plaintiff has been engaged in the sale of products in the hospital and medical fields since 1959. From 1963 until 1969 plaintiff was an independent distributor for The Richards Manufacturing Company ("Richards"). Richards produced medical and hospital supplies, placing special emphasis on its manufacture of orthopedic implants.

Plaintiff was quite successful as a Richards distributor and his success apparently did not escape OEC's attention. In 1969 OEC was a relatively small competitor in the hospital and medical supply market. As part of its effort to improve its competitive position, OEC at that time began to establish sales distributorships throughout the nation.

In 1969 OEC negotiated distributorship agreements with plaintiff and other individuals who had previously represented Richards. On September 15, 1969, the parties executed the contract here in question. The contract appointed plaintiff as OEC's sole and exclusive distributor for a territory encompassing the state of Virginia, West Virginia, North Carolina and South Carolina. This provision of the contract was subsequently modified by the parties such that plaintiff's territory became Virginia, West Virginia, North Carolina, Maryland and the District of Columbia.

Relations between the parties began to show signs of strain as early as December, 1969. Plaintiff was then directed to increase sales in his territory or suffer termination of his distributorship. Shortly thereafter, however, plaintiff was informed that this ultimatum was directed at distributors other than himself.

An October 14, 1970 letter informed plaintiff that his distributorship had been cancelled, "effective immediately." OEC premised the termination upon plaintiff's alleged breach of paragraph fifteen of the contract. Paragraph fifteen is a "best efforts" provision which states:

> During the term of this Agreement and any renewal period, DISTRIBUTOR shall exert his best efforts to sell and promote COMPANY'S products. At no time shall DISTRIBUTOR sell or promote, directly or indirectly, any items of merchandise normally sold in the medical and hospital field which are not invoiced by the COMPANY. It is understood that DISTRIBUTOR'S primary obligation is to sell and promote COMPANY products but nothing contained herein, however, is intended to prohibit DISTRIBUTOR, as an independent contractor, from engaging in fields of endeavor other than the sales of products normally sold in the hospital and medical fields.

There remains a dispute concerning whether OEC withdrew the October 14, 1970 termination. For the most part, that question was mooted by the entry of injunctive relief, precluding termination. What remains material in this regard, however, is that plaintiff was apprised that OEC considered paragraph fifteen to be in force.

Plaintiff continued to represent OEC into 1972. In April of that year OEC began

notifying plaintiff's customers that he no longer represented the company. The verified complaint was filed soon thereafter.

On May 13, 1972 the Court issued a temporary restraining order ("TRO"). The TRO prohibited OEC and Franklin I. Saemann ("Saemann"), who was then joined as a defendant, from any conduct which would interfere with plaintiff's pursuit of his business. The TRO specifically addressed such matters as samples and inventory, the withholding of commissions and dealer override payments by OEC and OEC's contacting plaintiff's accounts or his associates.

The parties subsequently stipulated to the terms of a preliminary injunction which was entered on May 25, 1972. The preliminary injunction was, for the most part, a mirror of the TRO. The preliminary injunction did, however, direct OEC to mail a retraction of their April 1972 notice to plaintiff's customers.

OEC filed its answer to the verified complaint on June 12, 1972. As one of its principal defenses, OEC alleged that plaintiff had breached paragraph fifteen of the contract. That allegation stated that plaintiff had continued to represent Richards after the creation of his OEC distributorship on September 15, 1969.

The matter was tried before the Court on February 20 and 21, 1973. At the conclusion of that trial the Court ruled as to the duration of the September 15, 1969 contract. The contract was found to be for an initial term of five years with five options for renewals of five years each. Renewals were deemed to be at the option of either party.

The parties thereafter settled those issues which were not presented to the Court in February, 1973. A final order which was to conclude this matter was entered on May 15, 1973. The contract, as previously interpreted by the Court, was to remain in effect. OEC paid plaintiff $35,000 "in settlement of his claim for damages" and $2,470.73 as part of his costs. A permanent injunction, as agreed to by the parties, was entered. Finally, as part of the settlement, Franklin I. Saemann was dismissed as a defendant.

The stipulated permanent injunction which was part of the settlement and final order contained the following provision:

(2) *[Plaintiff] will not combine, associate, agree or undertake to injure OEC in its reputation or business and will cooperate in the orderly conduct of its business.* In essence, cooperation includes the prompt delivery of items by OEC, and the cooperation on the part of both parties in billings. (Emphasis added).

The emphasized portion of the permanent injunction became significant some three years later when the Court was required to examine plaintiff's conduct.

Shortly after the settlement, on May 25, 1973, OEC was found to be in contempt upon its violation of the permanent injunction. The Court set June 14, 1973 as the date for a hearing on the penalty to be imposed, granting OEC until the hearing date to purge itself of contempt.

The June 14, 1973 hearing is more significant, however, for another reason. The Court and counsel engaged in extensive colloquy with regard to several issues of continuing disagreement. The following statements by the Court are representative of that colloquy:

Well, I think for my purposes today it may all be moot anyway because the Court's position on this is that of protecting the status of the parties at the time of the injunction. (June 14, 1973 Tr. at 24.)

and,

consistent with the Court's treatment of paragraph 16(a) and (b), the past practice may be viewed as frozen by the injunctions and changeable only upon mutual negotiation. (*Id.* at 25.)

and,

what is going to happen is that the Court is going to enforce the schedule of commission as practiced at the time of the preliminary injunction. (*Id.* at 28.)

and,

In short, stick to what the situation was as of the time of the injunction unless you can agree to change it. (*Id.* at 39).

608

The essence of the June 14, 1973 colloquy was, as evidenced by the above–quoted passages, a pronouncement that the preliminary injunction bound the parties to the status quo as it existed on May 25, 1973. The only exception which the Court recognized was modification upon the agreement of the parties.

The January 23, 1975 order recognized plaintiff's right, under paragraph five of the contract, to assign his distributorship to a partnership or corporation. This order was based upon a stipulation of the parties. The assignment to Major & Associates, Inc. ("Major & Associates") was expressly permitted. Plaintiff was, however, to remain bound by paragraph fifteen of the contract.

In January, 1975, the parties agreed to submit the interpretation of paragraph fifteen to the Court. OEC contended that plaintiff breached paragraph fifteen by representing the Sorenson Research Company. This allegation was reminiscent of the claim that plaintiff had, at one time, represented both OEC and Richards.

The Court's memorandum of March 19, 1976 interpreted paragraph fifteen. The Court rejected the arguments of both parties in reaching its conclusion. The Court reasoned that the conduct and practices of the parties between the execution of the contract and the May 25, 1973 injunctive order had effected a modification of paragraph fifteen. Thus the Court rejected OEC's contention that the contract barred plaintiff from making any sales of non–OEC products unless they were invoiced through OEC. Instead, the Court determined that, for sound business reasons, OEC permitted plaintiff to sell non–OEC products, e. g., where the customer insisted on another company's product or where OEC did not manufacture a similar item. This interpretation was more narrow than that claimed by plaintiff in that the Court concluded, and expressed the view, that paragraph fifteen prohibited plaintiff from representing other companies.

The execution of, and any proceeding to enforce, the March 19, 1976 order was stayed pending plaintiff's appeal to the United States Court of Appeals for the Fourth Circuit. That appeal was dismissed on August 11, 1977, the Fourth Circuit having concluded that the March 19, 1976 order was neither final nor appealable.

## I. MOTION BY OEC TO DISSOLVE THE INJUNCTION

OEC moved to dissolve the permanent injunction on March 23, 1976. The initial basis for this motion was the Court's ruling, on March 19, 1976, that plaintiff had violated both his contract and the injunction by representing the Sorenson Research Co. and Diffusan Sales, Inc. OEC, at the most recent hearing, presented further evidence of plaintiff's representation or attempts to represent other companies.

The issue before the Court is, of course, whether plaintiff's conduct entitles OEC to the relief sought. The inquiry necessarily proceeds from the premise that plaintiff may not represent other companies in the hospital and medical fields. That premise was established by the Court's memorandum and order of March 19, 1976 which rested upon the Court's view of the contract, the terms and purpose of the injunction and the parties' prior relationship.

OEC contends that the injunction must be dissolved by virtue of changed conditions, i. e., that to condone plaintiff's representation of other companies would render the decree an instrument of oppression. *System Federation v. Wright*, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961); *Chrysler Corporation v. United States*, 316 U.S. 556, 62 S.Ct. 1146, 86 L.Ed. 1668 (1942); *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). The Court has serious doubts that OEC has been injured to the extent claimed. At the same time, however, the Court reiterates the view of the March 19, 1976 memorandum that OEC is entitled to plaintiff's undivided efforts. The Court's difficulty is simply that it questions whether continuance of the injunction results in a "grievous wrong evoked by new and unforeseen circumstances" as that standard has been previously applied. *See e. g., Klapprott v. United States*, 335 U.S. 601, 69

S.Ct. 384, 93 L.Ed. 266 (1949); *Ridley v. Phillips Petroleum Company*, 427 F.2d 19 (10th Cir. 1970); and *Bigelow v. Balaban & Katz Corporation*, 199 F.2d 794 (7th Cir. 1952). In any event, in light of what follows, the Court need not resolve these issues.

The Court is of the view that another line of reasoning, one particularly well–suited to the facts of this case, is readily apparent. A universally recognized maxim of equity provides that a plaintiff must come to equity with clean hands if he is to be awarded equitable relief. *McCormick & Co. v. Childers*, 468 F.2d 757 (4th Cir. 1972). From this premise one deduces the corollary that the plaintiff's hands must remain clean throughout the litigation if he is to continue to receive the protection or benefit of equitable relief. *Collum v. Edwards*, 578 F.2d 110, 112 (5th Cir. 1978) ("[m]ore importantly, a permanent injunction . . . can be dissolved by the granting court if a party fails to comply with its terms."); *Gaudiosi v. Mellon*, 269 F.2d 873, 881–82 (3rd Cir.), *cert. denied* 361 U.S. 902, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959). The Court is of the opinion that plaintiff has repeatedly failed to satisfy this requirement and the permanent injunction will therefore be dissolved.

Throughout the most recent hearing in this case, plaintiff contended that he had no reason to suspect that he could not represent other companies. A consideration of the facts which gave rise to this litigation and subsequent events, however, demonstrates the contrary. As will be seen, plaintiff has been the architect of his own misfortune.

As early as October 14, 1970, plaintiff was notified that OEC intended to hold plaintiff to a strict interpretation of paragraph fifteen. This communication apparently related to plaintiff's alleged representation of Richards after the creation of his OEC distributorship on September 15, 1969. OEC reiterated its position in a memorandum to all distributors on September 21, 1971. OEC explicitly stated that it would not permit distributors to represent either competing or noncompeting product lines. *See* Appeal Record at 95. As a consequence of this letter, plaintiff terminated his relationship with the Xomed Company. *See* Memorandum of March 19, 1976, n. 2. It was thus very clear that paragraph fifteen and plaintiff's representation of other companies was of central importance in this action. Indeed, that issue was the *raison d'etre* for the inclusion of the second paragraph in the preliminary and permanent injunctions.

Plaintiff had further reason to suspect that he could not represent other companies when, in May, 1973, he sought to have OEC held in contempt for its unilateral change of the status quo. Additionally, the "stick to it" colloquy of June 14, 1973 should have alerted plaintiff to the need to continue those practices in effect when the preliminary injunction issued. Plaintiff was not then representing other companies. This was the gist of counsel's representation to the Court in 1973 and was affirmed by the Court in March, 1976.

Plaintiff nonetheless ignored the situation which gave rise to this suit, the representation of his counsel and the Court's June 14, 1973 admonition and affirmation thereof in March, 1976.

Plaintiff requested OEC's permission to represent The Sorenson Research Co., and did so (DX–1) despite OEC's denial of the request. Plaintiff also undertook to represent Diffusan Sales, Inc. (DX–2).

On June 11, 1974 OEC filed a motion for clarification of the injunction; the basis for same being plaintiff's representation of The Sorenson Research Company. Once again, plaintiff disregarded the obvious issue as to whether he could represent other companies. Plaintiff thereafter represented or sought to represent Tower Scientific (DX–3), Philadelphia Cervical Collar Co. (DX–4), Tysons International (DX–5), Miltex Instruments (DX–6), Hexcel Corporation (DX–7, 8), Argon Medical Corporation (DX–9), and Medic–OR (DX–10).

The next significant event was the Court's memorandum and order of March

19, 1976, which clarified the injunction as prayed for by OEC's motion and the parties' January 23, 1975 stipulation. The Court cannot imagine how the prohibition against representation of other companies could have been made more clear. Plaintiff disregarded even that order, however, and either contacted or represented International Medical Equipment and Supply (DX–11, 12), Britt Corporation (DX–13), Monitronics (IV Sensors) (DX–14), Zinco, Inc. (DX–15), and Anchor Continental, Inc. (DX–16).

Plaintiff would justify the immediately aforementioned violations upon the basis of the Court's having granted a stay at the time of appeal. That argument, however, fails to recognize that the stay postponed execution of judgment or sanctions, and not the injunction itself.

Furthermore, the force of this argument, if any there be, is totally undercut by plaintiff's arrangement with Durfold, Inc. (DX–17), after the appeal had been dismissed and the stay lifted.

The Court is aware that plaintiff signed the Durfold distributorship agreement on behalf of Major Medical, Inc. ("Major Medical"). Even the briefest consideration of the facts surrounding Major Medical will demonstrate that the Durfold contract violated the spirit, if not the letter of the permanent injunction. *See, e. g., Regal Knitwear v. N. L. R. B.*, 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661 (1945); *Equal Employment Opportunity Commission v. Longshoremen's*, 541 F.2d 1062, 1064 (4th Cir. 1976); *United States v. Hall*, 472 F.2d 261 (5th Cir. 1972); Fed.R.Civ.P. 65(d).

Major Medical was organized on August 31, 1977 shortly after the dismissal of the appeal by the Fourth Circuit. Major Medical's Articles of Incorporation state that it was organized for the same purposes as Major & Associates. Plaintiff was not a Major Medical shareholder although he was its first president and chairman of the Board of Directors. Major Medical and Major & Associates have the same mailing address, are operated from the same premises and use the same sales and office personnel.

Plaintiff assigned several of his distributorship contracts to Major Medical. The effect of this was to retain the OEC distributorship in Major & Associates and to have Major Medical selling other product lines. To permit this result under the permanent injunction would be to close the Court's eyes to the realities of the situation. Plaintiff's salesmanship is the principal asset of both Major Medical and Major & Associates. Plaintiff knows this and he has represented as much to the Court. Furthermore, the Court questions whether any of the customers of either Major & Associates or Major Medical can distinguish between the corporate entities. Indeed, the Court has had difficulty doing so since 1977. It is more likely, however, that these customers never gave the matter any thought—they simply knew that plaintiff was involved. Accordingly, the Court would include The Durfold representation by Major Medical in the list of plaintiff's violations.

The inescapable conclusion is that plaintiff has violated both paragraph fifteen and the Court's injunction in a number of respects. Those are, of course, in addition to his representation of Xomed and the alleged representation of Richards after September 15, 1969. If plaintiff did not know that this conduct was prohibited, then he was at least alerted, on several occasions, that the issue was one in serious dispute. Plaintiff failed to heed the Court's admonition of February 21, 1973 to "contact . . . counsel, who, in turn, may contact the Court for such interpretation as may be necessary." The Court cannot conclude otherwise than that plaintiff's hands have long been unclean. The injunction will therefore be dissolved.

## II. MOTION TO REINSTATE OR JOIN SAEMANN

This motion is totally devoid of merit and needs only the briefest consideration. Saemann, as has been noted, was originally joined as a defendant in this action. As part of the settlement of this action Saemann was dismissed from the controversy. There has not been a scintilla of evidence that this dismissal was procured by fraud.

In dismissing Saemann, plaintiff undoubtedly realized what is readily apparent to the Court as well. Saemann, an officer of OEC, was of course subject to the injunction's mandates even though he was no longer a party to this action. The permanent injunction, by its express terms, was applicable to OEC and "its officers, agents, servants, members and all persons acting by, through and for it . . . ." Further, Fed.R.Civ.P. 65(d) recognizes that an injunction is binding upon parties and "their officers, agents, servants, employees, and attorneys" as well. The plaintiff was thus afforded ample protection from any possible misconduct on the part of Saemann. This being so, there is no need for reinstating Saemann to this action even if the relevant portion of the settlement could be disregarded. Plaintiff's motion in this regard will therefore be denied.

## III. PLAINTIFF'S MOTION TO SHOW CAUSE

Plaintiff, on October 30, 1978, filed a motion to require OEC to show cause why it should not be held in contempt for violating the permanent injunction. The motion alleged that OEC and its officers and employees had violated each provision of the injunction. Certain acts, however, were alleged to be violative of more than one provision of the injunction.

The Court must first determine whether plaintiff seeks to hold OEC and its offending officers and employees in civil or criminal contempt. The distinction between civil and criminal contempt does not turn upon a characterization of the act of misconduct for "[c]ommon sense would recognize that conduct can amount to both civil and criminal contempt." *United States v. United Mine Workers*, 330 U.S. 258, 298–99, 67 S.Ct. 677, 698, 91 L.Ed. 884 (1947). Rather, the real distinction lies in the nature of the relief sought and the interests to be furthered by the relief. *Shakman v. Democratic Organization of Cook County*, 533 F.2d 344, 349 (7th Cir.) *cert. den.* 429 U.S. 858, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976); *Landman v. Royster*, 354 F.Supp. 1292, 1300 (E.D.Va.1973); 3 C. Wright, Federal Practice and Procedure § 704 (1969).

A contempt proceeding instituted to enforce a party's rights under a judgment or injunction is remedial in nature and purpose and is thus viewed as civil contempt. This must be contrasted with criminal contempt which exacts punitive penalties in order to vindicate the authority of the court. *Gompers v. Buck's Stove and Range Company*, 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911); *Landman, supra.* In the instant case plaintiff by this motion prays for enforcement of his rights under the injunction, payment of commissions allegedly wrongfully withheld and his costs and attorneys fees. The Court is thus concerned with an issue of civil contempt.

Plaintiff, as the moving party, bore the burden of demonstrating OEC's violation of the injunction by clear and convincing evidence. *Shakman, supra; Stringfellow v. Haines*, 309 F.2d 910 (2d Cir. 1962); *United States v. Greyhound*, 363 F.Supp. 525, 570 (D.C.Ill.), *supp.* 370 F.Supp. 881 (N.D.Ill.), *aff'd.* 508 F.2d 529 (7th Cir. 1974). The Court is of the view that plaintiff has failed to carry this burden with competent, credible and admissible evidence in each instance.

Plaintiff first contends that OEC did not take steps to adequately advise its employees of the terms of the injunction. In this regard, plaintiff relied upon deposition testimony of OEC officers. This, however, was not specifically required by the injunction. OEC's compliance with the injunction was the principal requirement and there is no evidence before the Court that this was not satisfied. OEC employees and officers had a general awareness of the injunction and this was, apparently, sufficient. It should be remembered that the injunction, for the most part, simply required OEC to work with plaintiff as it would any of its distributors, subject, of course, to his contract. No special information had to be disseminated to accomplish this end. Furthermore, when special instructions were

necessary, *e. g.* with regard to the Rajowalt Company, Inc. ("Rajowalt"), issues, those instructions were given. (DX–47).

Plaintiff's second allegation is that OEC violated the permanent injunction by permitting Rajowalt, OEC's wholly–owned subsidiary, to make sales in plaintiff's territory. Consideration of this issue requires a brief discussion of Rajowalt's merchandising practices, plaintiff's contractual rights and the injunction's mandate in this regard.

Rajowalt markets its products through surgical supply dealers and manufacturer's representatives. It does not rely upon independent distributors such as plaintiff, and Rajowalt does not sell directly to hospitals and doctors. Rajowalt's product line apparently includes items manufactured by itself as well as others, including OEC.

The Rajowalt issue first arose in connection with the dealer cut–off provision of plaintiff's contract. Under that provision plaintiff could elect to have OEC "cut–off" dealers in plaintiff's territory from selling OEC products. The condition precedent to this election, that plaintiff's sales reach a certain level, was satisfied and plaintiff made the election.

The Court, in 1973, determined that the intent of the dealer cut–off provision and the practice in effect when the preliminary injunction was entered, was that OEC not sell its products in plaintiff's territory through dealers. This would encompass any product bearing an OEC label, products manufactured by OEC, OEC–patented products and products listed in OEC's, but not the dealer's products. This must be contrasted with plaintiff's mistaken view that Rajowalt, through OEC, was prohibited from selling any products in plaintiff's territory which compete with OEC products. Plaintiff offered no evidence that OEC violated the injunction's requirements as they are properly interpreted.

Plaintiff next alleges that OEC violated the injunction by soliciting sales or contacting plaintiff's customers with regard to OEC products. The only suggestion of misconduct in this view relates to the image intensifier; a complex and expensive x–ray–like device. The evidence, however, established that plaintiff received a full commission on any sale resulting from said contacts and that contacts were necessary in order to market this product.

Plaintiff further alleges that OEC deviated from its usual discount practices with the effect that plaintiff has been deprived of commissions due him. This allegation stems from OEC's refusal to accept a 50–50 discounting policy and OEC's adoption of the level discount program.

The 50–50 discounting policy as described by plaintiff resulted in plaintiff and OEC equally sharing any discount given to the customer. Plaintiff asserts that OEC failed to agree to the 50–50 policy with regard to the extension of the Hospital Purchasing Services, Inc./OEC contract. The Court notes at the outset that OEC, not plaintiff, was a party to this matter. More importantly, plaintiff admitted that the 50–50 discount policy called for *ad hoc* decisions in each individual case. (Tr. 387). There was also evidence that this refusal was premised upon legitimate business reasons, *i. e.*, rising costs which reduced OEC's profit margin. OEC thus did not violate the injunction by refusing to agree to an extension of the Hospital Purchasing Services, Inc. ("HPS") contract under the 50–50 discounting policy.

Plaintiff further contended that Saemann, and consequently OEC, violated the injunction by making statements injurious to plaintiff's reputation and the conduct of his business. The only "evidence" of such misconduct which was mentioned in the 1980 hearing arose in the October, 1974 deposition of Floyd Hutson, another OEC distributor. Hutson purportedly summarized a statement of Saemann. Plaintiff, however, offered only one page of the deposition. Indeed, it remains unclear whether the Hutson deposition was taken in connection with this matter. Plaintiff, again, has simply failed to carry his burden in this regard.

There is no evidence upon which the Court may conclude that OEC wrongfully contacted plaintiff's employees. The only

suggestion of such contacts arose between Mike Combs and Jerry Ferguson, an OEC employee. Plaintiff conceded, however, that Combs was not an associate of plaintiff when the initial contact was made. The second contact was at Combs' instigation. Without more, the Court cannot find that OEC violated the injunction.

Plaintiff's final allegation is that OEC has failed to make prompt delivery of items as required by the permanent injunction. This allegation may be viewed in a broader sense as a claim that OEC did not cooperate with plaintiff to the extent contemplated by the injunction. The broader claim is more consistent with the testimony of the most recent hearing.

Without a doubt, there has been a delivery problem, at least from plaintiff's viewpoint. The difficulty with plaintiff's position is that it is not coincident with the requirements of the injunction. Plaintiff appears to believe that the injunction requires OEC to give plaintiff's orders its highest priority. In a sense, this position is not unreasonable, from a business standpoint, since plaintiff is one of OEC's most productive distributors. It is not, however, what was required by the injunction. The injunction, as was noted, *supra*, simply required OEC to honor its contract with plaintiff and otherwise treat him as it does its other distributors.

There was testimony of shipping delays; particularly with regard to emergency or rush orders. But there was also evidence of OEC satisfactorily responding to such orders. The Court's impression of this evidence is that OEC is not as efficient and responsible as it might be. The Court cannot, as a practical matter, however, use its injunctive powers to cause OEC to hire conscientious employees or manage its affairs in the most profitable manner.

Shipping delays might also be attributable to two other problems which may be considered in relation to OEC's duty to cooperate with plaintiff. This first problem may be identified as OEC's difficulties with back–order items. The other possible source of delay results from OEC's installa-tion of a computer to control orders and inventory.

The back–order problem arises where a distributor places an order for which the inventory is either short or nonexistent. The evidence was clear that OEC in the past has not maintained an effective system of inventory control. The evidence further showed that the back order problem has been aggravated by OEC's generosity in supplying Rajowalt's needs. Plaintiff admits, however, that the back order difficulty is a problem shared by all distributors. Furthermore, the back order problem is particularly acute for distributors like plaintiff, who place the most and larger orders as consequence of their higher sales. Finally, it should be noted that OEC has taken action to alleviate the back order problem. OEC has expanded its warehouse facilities and instituted a computerized program to gain better control over inventory needs.

There was also evidence that the computerized inventory and order system, while alleviating the back order problem, also tends to delay deliveries to plaintiff. Plaintiff's contract calls for a different commission schedule and discount policy than is in effect for most other distributors. Consequently, OEC's computer program cannot readily accommodate orders from the plaintiff. OEC therefore processes plaintiff's order by hand. This is obviously slower than for those orders filled by the computer. But there was no credible evidence that OEC failed to give plaintiff's orders the attention required by the injunction.

The final matter which must be addressed with regard to OEC's cooperation concerns a billing problem with Petersburg General Hospital. The evidence established that OEC shipped the hospital twice as much as it ordered. The invoice to the hospital corresponded to the amount shipped. The hospital returned the unordered merchandise and refused to pay the invoice until it was corrected. The invoice remained unpaid for ninety days, and OEC, pursuant to plaintiff's contract, deducted the arrearage from plaintiff's commission check.

OEC did not seem to dispute the allegation that the Petersburg General Hospital problem was a result of its mistake. There was no evidence, however, that this problem was anything other than a mistake. Plaintiff admitted that he had no doubt his commission account would be reconciled when the mistakes are resolved. Additionally, the facts of this problem had come to light only shortly before the most recent hearing and there is thus no reason to suspect that OEC is wrongfully and deliberately withholding the commission previously deducted.

## IV. OEC'S MOTION TO SHOW CAUSE

OEC, by motion of October 2, 1978, would have the Court hold plaintiff in contempt. The basis for this motion is plaintiff's representation of other companies in the hospital and medical field. The motion will be treated as one for civil contempt. *See* Part III, *supra.*

As previously stated, the Court's civil contempt power is properly exercised to insure compliance with the Court's order. *Landman, supra* at 1300–1301. Insuring future performance and compensating the aggrieved party is the basis for such relief. The contempt power, in this instance, is not punitive in nature.

■ The Court has, of course, found OEC's motion for dissolving the injunction to be well–taken. Thus, there is no longer an injunction requiring future compliance. This purpose of the exercise of the Court's contempt power has thus been obviated. The Court cannot determine that any other goal would be served by holding plaintiff in contempt. The motion will therefore be denied.

## V. PLAINTIFF'S MOTION TO RECONSIDER OR CLARIFY THE MARCH 19, 1976 RULING

Plaintiff has requested that the Court reconsider or clarify its memorandum and order of March 19, 1976. That ruling concluded that plaintiff could not represent either competing or noncompeting companies selling products in the hospital or medical market. The memorandum was sufficiently precise, and in light of that fact, and the Court's decision regarding dissolution of the injunction, there is no need to address plaintiff's request for clarification.

Plaintiff's principal contention in support of reconsideration concerns the enforceability of paragraph fifteen of the contract. Plaintiff argues that paragraph fifteen is unreasonably broad, and thus unenforceable, if it is interpreted to prohibit his representation of product lines which do not compete with OEC. For the reasons which follow, the Court disagrees.

Neither party has cited the Court to Virginia law addressing the enforceability of a restraint upon an employee during the term of his employment. The Court is of the view that it should thus be guided by the analysis required with regard to covenants not to compete following the termination of employment. The Court should thus consider whether the restraint is no more severe than is necessary to effectuate a legitimate interest of the employer, whether it unduly restricts the employee's ability to earn a livelihood and whether the restraint contravenes public policy.

OEC undoubtedly has a legitimate interest in requiring plaintiff to devote his fullest efforts to the promotion of OEC. Plaintiff argues, however, that paragraph fifteen is more restrictive than is necessary because the representation of complementary lines provides an entrée to new markets. This argument, however, ignores OEC's policy of permitting distributors to sell any product, on an individual basis, whenever requested or needed by the customer. The existence of this policy narrows the prohibition to that which is necessary to serve OEC's legitimate needs.

Nor is there any indication that paragraph fifteen is unduly harsh or oppressive in limiting plaintiff's ability to earn his livelihood. Indeed, a contrary conclusion would be compelled by plaintiff's claims regarding the value of his OEC distributorship. Plaintiff is not, in fact, unduly restricted as shown by his business success.

The only limitation which appears to oppress plaintiff is that paragraph fifteen does not allow plaintiff to diversify his business to the extent he desires. That is not the type of limitation to which this branch of the analysis is directed.

█ The Court is of the view that paragraph fifteen does not contravene the public policy of the Commonwealth of Virginia. At the outset, it should be reiterated that paragraph fifteen is a restriction during the term of the employment, not after, and as such should be given greater latitude than a restraint in the latter case. Plaintiff's contract appointed him OEC's exclusive distributor in four states and the District of Columbia. The contract provided plaintiff with employment security for thirty years. Additionally, the contract also afforded plaintiff rights which were denied the great majority of other OEC distributors. Public policy is not offended when, as part of the consideration for the aforementioned rights, plaintiff is obligated not to represent other companies in the same market. This would be especially true where, as here, the distributor himself is the principal asset of its business.

Plaintiff further contends that reconsideration is in order because the March 19, 1976 ruling appears to be contrary to a portion of the June 14, 1973 colloquy. Plaintiff relies upon the following passage:

*Mr. Slater:* That is fine, because you see, Mr. Horsley negotiated with them [OEC] and we didn't get that impression. We thought he was barred from any medical business.

*The Court:* Maybe that is the way they feel, but that is not the way I feel, and I am giving you my initial view. (June 14, 1973 Tr. at 34.)

Plaintiff's reliance upon this passage is misplaced for several reasons. First, the Court cautioned the parties that it was stating only an initial view on several outstanding issues. Second, the overriding tenor of this colloquy was that the parties continue the status quo as of the entry of injunctive relief. Third, the only evidence concerning the status quo on June 14, 1973 was plaintiff's representation that he no longer was a distributor for another company. Finally, the transcript reveals that this portion of the colloquy addressed plaintiff's options subsequent to the termination of his distributorship. That issue is governed by paragraph twenty–two of the contract which provides:

If this Agreement should be terminated by DISTRIBUTOR, the individual distributor or principal of a corporate distributor, shall not, for a period of one (1) year after such termination, in the territory specified in Article 3 hereof, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation, sales or control of any business in competition with the business conducted by the COMPANY. . . .

The colloquy is thus consistent with paragraph twenty–two's prohibition against competing, but not noncompeting, endeavors. The colloquy thus does not provide a basis for altering the March 19, 1976 order.

Plaintiff, as the next basis for reconsideration, raises an opinion of OEC's counsel regarding distributors' rights under paragraph fifteen. OEC, however, contends that the opinion addressed a different version of the best efforts clause. In any event, the opinion did not consider the effect of an injunction such as entered in this case or plaintiff's personal involvement in the affiliated corporation, Major Medical.

The Court has considered plaintiff's other arguments for altering the March 19, 1976 order, *e. g.*, the decision in *Streetman & Associates, Inc. v. OEC*, Cir.Ct., Orange County, Florida; plaintiff's claim that OEC has not been injured by his representation of other companies; and his claim that paragraph fifteen does not preclude representation of noncompeting product lines. These or similar arguments have been presented to the Court and found unpersuasive on prior occasions. They need not be addressed herein.

**616**

## VI. CONCLUSION

For the reasons previously stated, the Court has determined that OEC's motion to dissolve the permanent injunction must be granted. Plaintiff has, by his own admission, violated the injunction in numerous instances. A review of the entire record in this matter belies plaintiff's assertions that the violations were without knowledge or suspicion of wrongdoing.

There is no basis for reinstating Saemann to this action, and plaintiff's motion in this regard must be denied.

Plaintiff has failed to carry his burden of proof with respect to his motion to show cause. The Court has not closed its eyes to the animosity which characterizes both sides of this relationship. And, of course, OEC has been held in contempt in this action in 1973. The Court cannot, however, consider OEC as perpetually tainted and can only find defendant in contempt upon proof by credible and admissible evidence.

OEC's motion to show cause will also be denied. The civil contempt powers of the Court are to be exercised to insure future compliance with its orders. The exercise of these powers, in light of the dissolution of the injunction, would be punitive, rather than remedial.

The Court has considered plaintiff's arguments and found no basis for amending the March 19, 1976 memorandum and order. The issues presented in plaintiff's motion for reconsideration or clarification have, for the most part, been addressed before and are better saved for appellate review. Plaintiff's motion will, therefore, be denied.

One final matter must be addressed. OEC, through its officers and counsel, has indicated it intends to terminate plaintiff's distributorship as provided by the contract, when the injunction is dissolved. Accordingly, the Court will stay the effect of its order for a period of thirty (30) days within which time plaintiff may note his appeal to the United States Court of Appeals for the Fourth Circuit, if he so desires. If an appeal is taken, the Court will entertain a motion to continue the injunction during the pendency of the appeal.